UNITED STATES of America, Plaintiff–
Appellee, Cross–Appellant,

v.

Joseph M. CUSTODIO, Defendant–
Appellant, Cross–Appellee.

Nos. 93–1443, 93–1444.

United States Court of Appeals,
Tenth Circuit.

Nov. 8, 1994.

Raymond P. Moore, Asst. Federal Public
Defender (Michael G. Katz, Federal Public
Defender, with him on the brief), Denver,
CO, for defendant-appellant.

Gregory C. Graf, Asst. U.S. Atty. (Henry
L. Solano, U.S. Atty., with him on the brief),
Denver, CO, for plaintiff-appellee.

Before BRORBY, Circuit Judge, LAY, Senior Circuit Judge,[1] and McWILLIAMS, Senior Circuit Judge.

LAY, Senior Circuit Judge.

Dr. Joseph M. Custodio, M.D. was convicted of eighteen counts of submitting false claims to the United States under 18 U.S.C. § 287[2]. He appeals his conviction on the grounds the district court erred in instructing the jury and in denying his motion for acquittal on all counts based on insufficient evidence of intent. The Government cross appeals, claiming the district court erred in applying the sentencing guidelines.[3] We affirm.

*FACTS*

Dr. Custodio was a licensed obstetrician-gynecologist (OB–GYN) employed as a full-time, in-house civilian "partner" of a medical insurance program at Evans Army Community Hospital (EACH). The insurance program, called CHAMPUS (Civilian Health and Medical Program for the Uniformed Services), serves dependents of service personnel by paying nonmilitary professionals to provide health care. Evans is a U.S. Army hospital in Fort Carson, Colorado. CHAMPUS brought private physicians into EACH to treat the dependents of service personnel. These physicians became CHAMPUS "partners."

CHAMPUS partners provide services for which they bill CHAMPUS. Because the government provides the facilities, equipment, supplies, and nursing staff, CHAMPUS partners are expected to bill significantly less than they would bill if they treated patients at their own facilities with their own staff, equipment, and supplies. CHAMPUS establishes schedules which give the amount, called the "prevailing rate," that it will pay for all the various kinds of medical procedures that may be performed. The govern-

ment negotiates with each private care provider a discount percentage which is to be applied to the CHAMPUS prevailing rate to determine the amount the provider can bill CHAMPUS. Dr. Custodio's partnership agreement provided that he would bill at sixty percent of the CHAMPUS prevailing rate.

Dr. Custodio worked in the OB–GYN department at EACH with other CHAMPUS partners and active duty medical professionals. The active duty health care providers did not bill for their work because they received salaries from the Army. Dr. Custodio and other CHAMPUS partners billed for every procedure they performed.

In addition to treating patients, Dr. Custodio's responsibilities included supervision and being on call. The family practice doctors, residents, and midwives were certified to perform certain procedures independently. Some other procedures they might perform under the supervision of an OB–GYN, and some procedure they could not perform under any circumstances. The family practice doctors and midwives, for example, could perform normal vaginal deliveries as well as take admission histories and do physical examinations without supervision by an OB–GYN, but they could not independently perform a cesarian section.

Documentary evidence together with testimony from patients and members of the OB–GYN department established that Dr. Custodio billed CHAMPUS for services others performed without his supervision. In some instances he was not physically present when the services were performed; in some instances he was briefly present, but not at the request of the provider. He also billed twice for some procedures and billed for other procedures no one performed. He billed for

---

1. Honorable Donald P. Lay, Senior Circuit Judge for the United States Court of Appeals for the Eighth Circuit, sitting by designation.

2. 18 U.S.C. § 287 provides:
   Whoever makes or presents to any person or officer in the civil, military, or naval service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, ficti-

tious, or fraudulent, shall be imprisoned not more than five years and shall be subject to a fine in the amount provided in this title.

3. The defendant was sentenced to concurrent probation for five years on each count, with special conditions of three months community corrections to be followed by three months home detention. He was also ordered to make restitution and to provide community service.

procedures done by other OB–GYNs, family practice doctors, and certified nurse midwives, procedures they were fully qualified to perform without his supervision.

Most of the eighteen counts for which Dr. Custodio was convicted were instances where he billed for either an admission history and physical examination and/or a normal spontaneous vaginal delivery and post-partum care which another person performed. The CPT states that "delivery services" include an admission history, physical examination, and post-partum care.[4] In some instances, Dr. Custodio billed for delivery services and separately billed for an admission history and physical as well as post-partum care. The Government however, did not charge Dr. Custodio with fraud in unbundling and the court did not admit evidence of unbundling at trial.[5]

To bill CHAMPUS, Dr. Custodio had to sign a patient chart and a claim form, part of which the patient filled out first, submitting the latter to CHAMPUS's fiscal intermediary, Blue Cross/Blue Shield via an electronic data service.

Dr. Custodio did not contest that he filled out claim forms for procedures he did not perform. Although Dr. Custodio did bill for work he did not do, he urges that the Government failed to prove that he acted with the intent to defraud. Dr. Custodio made no secret of the fact he was signing other people's charts and having patients he did not treat fill out claim forms.

When he heard complaints about his billing, Dr. Custodio went to Dr. Patsy Webber-Hunt. Dr. Patsy WebberHunt was the Assistant Chief or Acting Chief of the OB–GYN department for about two months of the ap-

proximately one year period Dr. Custodio worked at EACH. Dr. WebberHunt testified that on becoming aware of the complaints, she told Dr. Custodio she would talk with Colonel Strampel, the Deputy Commander for Clinical Services at EACH and second in command of the hospital,[6] about the matter and would inform Dr. Custodio of what the Colonel said.

Dr. WebberHunt spoke with Colonel Strampel about whether Dr. Custodio could bill for procedures performed by nurse midwives and residents. She did not speak with him about whether Dr. Custodio could bill for procedures performed by family practice doctors. Dr. WebberHunt reported to Dr. Custodio that he could bill when he was supervising nurse midwives and residents. She also told him her interpretation of what Colonel Strampel had said was that he could bill when he was supervising family practice doctors, although she did not specifically speak with Strampel on that question and only his interpretation counted. She stated she had never told Custodio he could bill for procedures performed by other OB–GYNs.

Dr. WebberHunt also testified she had no knowledge of Custodio's fee for service agreement with CHAMPUS, and no authority to determine how Custodio was paid. Furthermore, her duties did not involve monitoring the CHAMPUS program.

Colonel Strampel testified that as a CHAMPUS partner, Dr. Custodio could bill for procedures performed by residents that he directly supervised, that is, if he were in the same room and prepared to handle any problems the resident might run into. Colonel Strampel denied telling Dr. WebberHunt that Dr. Custodio could bill for work per-

---

**4.** *The Physicians Current Procedural Terminology Book*, called the CPT, is the standard system for coding procedures performed by health care providers and was used by CHAMPUS partners in their billing. Most procedures are represented by an individual code but some codes represent several procedures. For example, the code for delivering a baby includes not only the actual delivery, but also an admission history, a physical examination, and post-partum care.

**5.** As the Defendant explains in his brief:
[u]nbundling occurs when a bill includes an all inclusive billing code for a delivery or proce-

dure and additional codes for procedures subsumed in the all inclusive code. For example, where a "delivery" charge (*e.g.* Code 001) includes a history and physical (Code 002), billing for both codes 001 and 002 involves overbilling in that the history and physical is essentially included twice by "unbundling" that procedure as a separate service.

**6.** Colonel Strampel's position made him the military equivalent of a civilian hospital's chief of medical staff.

formed by family practice doctors, certified nurse midwives, or other OB–GYNs.

Colonel Strampel recalled a number of conversations he had with Dr. Custodio during which the subject of Custodio's poor relations with other staff members came up. At various times, Colonel Strampel had heard from the active duty members of the department that Dr. Custodio was more interested in billing than in treating patients. He specifically recalled one nurse had reported to him that Dr. Custodio had signed her patient's chart but the patient did not recall ever seeing the doctor. When questioned by Colonel Strampel, Dr. Custodio replied that either the patient had forgotten him or he had signed the wrong chart. Colonel Strampel further testified it is common knowledge that physicians are not supposed to bill for procedures others performed. It does not appear Dr. Custodio ever brought up his concerns about billing practices to Colonel Strampel.

Dr. Custodio was terminated as a CHAMPUS partner as a result of an investigation by the Inspector General initiated by Nurse Lieutenant Vargo as a result of her experience with Custodio as a patient in the OB–GYN department. Dr. Custodio had attempted to make Lieutenant Vargo fill out a CHAMPUS claim form for him, telling her he had reviewed her chart. Lieutenant Vargo asked what had happened to the claim form she had filled out on entry. Dr. Custodio replied "the pediatrician must have picked it up for the circumcision of your baby." Lieutenant Vargo responded "I thought you had reviewed my chart. I had a girl." Dr. Custodio also signed Vargo's chart for a physical examination he had not performed.

## THE "DELIBERATE IGNORANCE" INSTRUCTION

At the conclusion of the trial, both parties provided the court with their proposals for jury instructions. The Government included a deliberate ignorance instruction in its proposal. Dr. Custodio objected to the deliberate ignorance instruction. If the judge determined to give one, however, Custodio offered an edited version of the instruction to be used. The trial court agreed to use the edited version. The instruction stated:

> You may find the defendant had knowledge of a fact if you find beyond a reasonable doubt that the defendant deliberately closed his eyes to what would otherwise have been obvious to him. Knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was negligent, careless or foolish. However, knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact.

■ The adequacy of a jury instruction is reviewed *de novo* in light of the instructions as a whole. *United States v. Sasser*, 974 F.2d 1544, 1551 (10th Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 1063, 122 L.Ed.2d 368 (1993) (citations omitted). The court must review the tender of a deliberate ignorance instruction in the light most favorable to the government. *Id.* To decide "whether a deliberate ignorance instruction is appropriate, we have stressed that evidence is required showing that the defendant denies knowledge of an operative fact and defendant's actions include deliberate acts aimed at avoidance of actual knowledge." *United States v. Hilliard*, 31 F.3d 1509, 1516 (10th Cir.1994) (citing *United States v. de Francisco–Lopez*, 939 F.2d 1405, 1411 (10th Cir.1991). An erroneous jury instruction requires reversal only if the error is prejudicial. *United States v. Self*, 2 F.3d 1071, 1085 (10th Cir.1993) (citations omitted).

■ Dr. Custodio argues that what he did may have been wrong, but he did it openly, he received permission from his superior, Dr. Patsy WebberHunt, to do it, and he did not avoid Colonel Strampel or otherwise try to evade discovering that what he was doing was improper. Testimony at trial did establish that Dr. Custodio did not take pains to hide his billing practices from his co-workers. He told nurses to fill out forms for patients they knew he had not treated. Several doctors and a midwife complained to him about his billing for work he did not do. To every complaint, Dr. Custodio responded that was the way the system worked.

We agree there was evidence from which the jury could infer Dr. Custodio did not

deliberately avoid learning that his billing practices were fraudulent, but we also find substantial evidence from which the jury could reasonably infer conscious avoidance. As the Government argues, this inference follows from considering who Dr. Custodio asked about proper billing practice, when he asked, who he should have asked, and what he did after he asked. Indeed, the very fact Dr. Custodio made any inquiries at all suggests he was aware there was a problem.

Although Dr. Custodio did speak with Dr. WebberHunt about what he could legitimately bill for, she did not know—she had to talk with Colonel Strampel. Dr. WebberHunt was not a career officer. She stated she had no knowledge of the CHAMPUS program or its regulations or Dr. Custodio's partnership arrangement. She had no authority to modify the agreement. Her authority over Dr. Custodio extended only to patient care. She had no knowledge of what occurred in the prior exchanges between Dr. Custodio and Colonel Strampel. She had no authority to tell Dr. Custodio anything except her interpretation of what Colonel Strampel told her. Further, she told Dr. Custodio she talked to Colonel Strampel about residents and midwives, but not about family practice doctors.

As to the timing of Dr. Custodio's questions to Dr. WebberHunt, he made his inquiries four months after he became a CHAMPUS partner, at a time when Colonel Strampel was completely inundated with tasks associated with the Desert Storm/Desert Shield campaign in the Middle East. The real chief of the OB–GYN section, Lt. Colonel Paul Webber, was then on temporary duty related to Desert Storm/Desert Shield. His temporary replacement, Dr. WebberHunt was only Acting Chief for a total of two months.

Rather than going to Dr. WebberHunt, Dr. Custodio could have spoken with Colonel Strampel. Dr. Custodio's partnership agreement directed him to address questions about the agreement to the Commander of the U.S. Army Health Services, not the Chief or Acting Chief of OB–GYN. He negotiated his CHAMPUS agreement with Colonel Strampel and logically should have sought him out to resolve any issues. Dr. Custodio did speak with Colonel Strampel on at least three or possibly four occasions where the focus of the conversation involved staff perceptions that Custodio was overly concerned about money. During those conversations Dr. Custodio did not bring up his concerns about billing practices and the jury could readily infer that Dr. Custodio avoided talking about the subject.

Events subsequent to Dr. Custodio's discussion with Dr. WebberHunt put him on notice that the guidance she gave him was bad. Nurse Lynne Schmidtke told Custodio twice that she thought it was wrong for him to bill for procedures he did not perform. Doctors Deldo and O'Keeffe refused to let their patients sign CHAMPUS claim forms for Dr. Custodio. Custodio did not tell either of them that he was permitted to bill their patients. Dr. Custodio was also on notice from his experience with Lieutenant Vargo when she refused to fill out a claim form for him. Dr. Yancey, who performed Vargo's delivery, also told Custodio he was not supposed to make write-ups in people's medical charts for examinations he did not conduct.

If Dr. Custodio believed he had permission to bill for work he did not do, the jury could reasonably have expected he would have conveyed that to the many people who complained to him. He might very well have gone to Colonel Strampel and requested the Colonel do something to prevent others from interfering with his legitimate billing practices. We conclude there was no error in the instruction. We find there was substantial evidence on which the jury could find Dr. Custodio willfully avoided learning that he could not bill for procedures he neither performed nor supervised. We also find the Government presented sufficient evidence to show Dr. Custodio knowingly submitted false claims against the Government.

*CROSS APPEAL*

■ As to the Government's issues on cross appeal, we have examined them and find they are without merit. The Government urges that Dr. Custodio abused a position of trust and the district court erred in not enhancing his sentence under Section 3B1.3 of the *Sentencing Guidelines*. The Government had the burden to prove, by a preponderance of the evidence, that Dr. Cus-

todio abused his position of trust. We agree with the district court that something more than his being a CHAMPUS partner is required for the Government to meet its burden. The court could correctly find the wrong was difficult to detect as a result of the way the CHAMPUS system worked and that Custodio's position did not allow him to make his wrongs more difficult to detect, although it did allow him to abuse the system.

The Government also argues that Dr. Custodio's practice of unbundling procedures was relevant uncharged conduct. Again, the Government bears the burden of proving, by a preponderance of the evidence, the relevance of the uncharged conduct. The Government argues that Dr. Custodio's billing for the inclusive procedure as well as for its component procedures, should have been taken into account in sentencing him. We agree with the district court's reasoning that because the Government did not establish that unbundling was the same type of conduct and was not the same scheme or plan as the charged conduct, the unbundling should not figure into Custodio's sentence. The court was concerned that defenses could have been presented if the unbundling had been charged. Unbundling could have occurred by mistake or misunderstanding. The district court correctly found the Government failed to meet its burden.

Similarly, we find no error in the district court's determination of the loss amounts. The court could appropriately exclude the amounts resulting from unbundling and could set the intended loss amount at what Custodio billed CHAMPUS or the actual amount CHAMPUS paid, as opposed to the full amount of the claim submitted.

We find no merit in the Government's cross-appeal.

THE JUDGMENT OF CONVICTION IS AFFIRMED.