**UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**

**Filed 11/8/96**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

PETER I. PHILIPS,

    Defendant-Appellant.

No. 95-6294
(D.C. No. CR-94-83-L)
(W.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **EBEL, HOLLOWAY,** and **HENRY,** Circuit Judges.

Defendant and five others were indicted on charges of wire fraud (18 U.S.C. § 1343), money laundering (18 U.S.C. § 1957(a)), and conspiracy (18 U.S.C. § 371). Only one of the other indicted individuals was apprehended. Defendant eventually pleaded guilty to one count of a superseding indictment alleging conspiracy to commit wire fraud and money laundering. He was sentenced to 48 months' confinement and to three years of supervised release thereafter. This timely direct appeal raises only sentencing issues.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

# I

Defendant admitted participating in an international swindle which involved other conspirators falsely representing themselves as officials of the Nigerian government or the Central Bank of Nigeria.[1] The victim was a German citizen named Woschny who owned a computer firm which we will refer to as H & S. In October 1993, the victim attended a trade fair in Munich where he met one Mr. Roda, an unindicted co-conspirator of defendant. Roda told the victim he could make contacts for him with Nigerian businessmen who would be interested in the services of H & S. Several weeks later the victim was contacted by another Nigerian who told him that the Nigerian government was in the market for a sophisticated computer system to use in anti-smuggling efforts. The caller, who identified himself as Prince Mingi XII Cookey, also said that the project was top secret and would be conducted under the "cover" of the Nigerian National Petroleum Corporation.

The suggestion of a sizable government contract to be won apparently was just bait to lure the victim into dealing with the conspirators. A couple of months after the first contact, "Prince Cookey" wrote to the victim, representing himself to be the head of a governmental committee, and soliciting the victim's participation in a plan to acquire $22

---

[1]This summary of facts is taken from the Presentence Report and the transcript of the sentencing hearing. Defendant disputed relatively few of these facts in the district court and does not now contend that the district court erred in relying on the PSR, *per se*, even though the PSR does not specify the sources of much of the information it relates. Defendant's material objections to the PSR were resolved in favor of the government, as were the issues of contested fact arising from the sentencing hearing. We of course review these factual determinations only for clear error and we state the facts as determined by the district court.

million supposedly on deposit with the Central Bank of Nigeria. These funds supposedly had been appropriated by the Nigerian government to pay a Yugoslavian contractor. The contractor had over billed the government, the victim was told, and thus had no legitimate claim to the funds. Cookey offered to pay the victim 20% of these monies (or about $4.5 million) in return for using the account of the victim's company as a destination for a wire transfer of the funds. Eventually the victim was told it was necessary for him to pay 3% of the $22 million, purportedly as a transfer fee imposed by the Nigerian government for removal of the funds from Nigeria. The victim made three separate wire transfers to a London bank, totaling about $486,000, on the premise that these funds were going towards the 3% transfer fee.

Then the conspirators came up with another hurdle for the victim to clear before completion of the transfer of the $22 million. While the above machinations were occurring, a co-conspirator named Robert Sensi and another man, whom the investigating agent and the district judge concluded was our defendant but whom defendant claims was his identical twin Johnny Philips Okipiri, leased an office in New York City and arranged for a telephone line and two fax lines to be installed. The office was leased in the name of Guaranty Trust Company, Inc., while the telephone accounts were put in the name of International Trading and Clearing Corporation. Apparently communications from this office used yet another name, International Credit and Finance Group ("ICFG"). Later Okipiri and Sensi used these facilities to send faxes to the victim, which were signed in the name "Mark Devenport."

3

Eventually the conspirators got the victim to pay another $330,000, which was purported to be a 1.5% cable and communications fee, after which the $22 million supposedly would be released to the victim's account.

This wire transfer of $330,000 was made to Boatmen's Bank in Oklahoma City identifying as the beneficiary Loretta Riley, a bank officer, but referencing defendant's account number, as had been arranged between defendant and the conspirators communicating with the victim through ICFG. Because of the discrepancy between the account and the named payee of the wire transfer, the bank put a hold order on the funds. Another contact with the victim was made to induce the victim to send new instructions for the wire transfer so that defendant would have access to the funds. Defendant then began spending and disbursing the funds. He bought an Oklahoma City nightclub for $26,000 and two limousines for $45,000. Defendant wired $20,000 to Sensi's account in Washington and $155,000 to Hong Kong and London for accounts of other co-conspirators. Defendant also purchased two cashier's checks, one for $50,000 and one for $5,000, both payable to himself.

Defendant was on supervised release from a previous conviction but had received permission to go to Nigeria. Ten days after receipt of the wire transfer in Oklahoma City, defendant was arrested at the Oklahoma City Airport. He had a ticket to New York and the two cashier's checks with him, along with documents relating to the night club and the automobiles he had purchased.

Some two months after defendant's arrest, the New York offices of ICFG were

4

searched. Authorities found files on 114 "customers" believed to be actual or prospective targets for the conspirators. One of these files dealt with a Dutch company called Translumber. The documents showed that the same conspirators had pulled a similar fraud on this company. In March 1994, during the time that the crimes charged were in progress, Translumber had wired $25,000 to defendant's account at Boatmen's in Oklahoma City. (Apparently the IRS had begun investigating defendant in January 1994, when Boatmen's Bank reported unusual activity in defendant's accounts unrelated to either the scheme in which defendant admitted complicity or the Translumber scheme.)

Co-defendant Sensi was the only other conspirator apprehended. The government sought several postponements of defendant's trial to permit additional time for investigation and search for the other conspirators. A few days before the scheduled trial date of April 10, 1995, defendant and Sensi entered guilty pleas. Defendant made this statement in his petition to enter a guilty plea:

> In May 1994, I conspired with others to defraud a German citizen of money. In furtherance of the conspiracy, I maintained a bank account at Boatmen's Bank in Oklahoma City, for the purpose of receiving funds derived from the conspiracy. I received approximately $330,000 in that bank account. I know my actions were wrong and I accept responsibility for those actions.

Defendant declined to provide any other information to the government. Additional facts will be recited as necessary to discussion of the issues raised.

## II

We will first consider defendant's contention that the district court erred in refusing

5

to grant him a two point downward departure under section 3B1.2 of the Guidelines as a "minor participant." Section 3B1.2 vests discretion in the district court to grant an offense level reduction if it finds that the defendant is less culpable relative to other participants in the offense. United States v. Santistevan, 39 F.3d 250, 253-54 (10th Cir. 1994). The reduction is four levels for a "minimal" participant, two levels for a "minor" participant, or three levels for a defendant who falls in between those categories. Although Mr. Philips did not request more than a two level departure, the comparative approach provided in the authoritative commentary to this Guideline involves first defining who may be regarded as a "minimal" participant.

A four-level reduction for minimal participation is reserved for defendants "who are plainly among the least culpable of those involved" and should be used "infrequently." USSG § 3B1.2, comment. (nn. 1-2). The two-level decrease for minor participation applies to those who are "less culpable than most other participants, but whose role could not be described as minimal." Id. comment. (n. 3). See Santistevan, 39 F.3d at 254. The burden of proof is on defendant to establish his entitlement to a reduction of his offense level. Id.

We review the district court's factual findings under the clearly erroneous standard. Id. at 253-54. The ultimate decision not to depart from the Guidelines is reviewed for abuse of discretion. See Koon v. United States, 116 S.Ct. 2035, 2046-48 (1996) (abuse of discretion standard applies to review of district court's decision to depart from the Guidelines).

6

In rejecting defendant's argument for a reduction under this section, the district judge found that defendant had been instrumental in setting up the New York offices of ICFG, had maintained the Boatman's Bank account, and had personally profited from the fraudulent scheme, citing the cashier's checks he possessed at the time of his arrest and the vehicles and the night club that he had purchased. The judge found that a minor participant would not have received such a large share of the proceeds, nor have been trusted with sole control over the bank account which was used to receive the $330,000.

Defendant contends that he was entitled to a finding that he was a minor participant because he did not have any contacts with the victim and had nothing to do with obtaining the money. He contends that he was not shown to have had knowledge of the extent of this broad, international conspiracy; that his role did not begin until he was informed that the money would be coming to his account; and that he was directed to disburse the money to other conspirators. Defendant cites the fact that his name was found in only two of the 114 files seized from the office of ICFG in New York. He also relies on the fact that the indictment originally had alleged that his twin brother, Johnny Philips Okipiri, was the one who set up the ICFG office.

We first note that defendant produced no evidence to support his contention that he disbursed the fraudulently obtained funds only as directed by others. The district judge found that defendant was the one who set up the ICFG office, and we cannot conclude that this finding was clearly erroneous because it is supported by substantial evidence. Agent Duane

7

Shriver, the IRS case agent assigned to the case, testified that the New York office was leased in the name of William Norman, using Norman's social security number. Investigation revealed that this William Norman had been a student at the University of Central Oklahoma and had taken a class with defendant Philips. (There apparently was no evidence that Norman was aware that his name had been used.) Defendant Philips was on supervised release from a prior conviction. He had obtained permission from his probation officer to travel to Tampa on the date the office was leased. He had canceled his Tampa ticket, however. Calls from defendant's cellular phone were made from New York on January 25, 1994, the day the office was leased, and hotel charges had been paid with a credit card which was found in defendant's possession at the time of his arrest. Investigation revealed that Johnny Philips Okipiri had been traveling abroad using defendant's passport, and passport records indicated that he had been in London on January 21, 1994, and had left England for Germany in February. Co-defendant Sensi had identified defendant as the one who was with him in New York and leased the office. In light of this evidence, we see no error in the district court's finding that defendant participated in the conspiracy by setting up the New York office.

Defendant's involvement in setting up the New York office, which became an important part of the scheme as we have described, and his role as sole custodian of a substantial portion of the fraudulently obtained proceeds were, we think, ample basis for the district judge's finding that defendant was not a minor participant. We also note that the

8

evidence was that defendant was in very frequent telephone contact with other conspirators during the time that the fraud was being perpetrated.

In sum, defendant failed to carry his burden to show that he was entitled to a reduction in his offense level. The district court's findings pertinent to this issue are not clearly erroneous, and we see no abuse of discretion.

**III**

As we have noted, defendant's guilty plea was to Count One, which charged conspiracy to commit both wire fraud and money laundering. Under USSG § 1B1.2(d), which is discussed more specifically in Part V, *infra*, a conviction on a count charging a conspiracy to commit more than one offense is treated as if defendant had been convicted on a separate count of conspiracy for each offense. Accordingly, the offense level calculation in the PSR began by separately determining the offense level for money laundering and wire fraud. For both of those crimes, the amount of loss caused or intended to be caused is a "specific offense characteristic" which results in an increase in the offense level according to a graduated scale. USSG §§ 2F1.1(b) (wire fraud), 2S1.2(b)(2) (money laundering). The calculation of loss was thus a factor in the sentence ultimately imposed on defendant.

In setting the amount of loss the PSR included, without objection from the defendant, the $330,000 received by defendant from the victim in the transaction charged in Count One. The PSR also included in the amount of loss the $25,000 wired to defendant's account by Translumber. Defendant contends that his receipt and disbursement of this money should

9

not have been considered "relevant conduct" under USSG § 1B1.3.

The district court's factual findings, including its decision to include this transaction as relevant conduct in determining defendant's offense level, are reviewed under the clearly erroneous standard. See United States v. Richards, 27 F.3d 465, 468 (10th Cir. 1994). We are to accord due deference to the district judge's application of the Guidelines to the facts. 18 U.S.C. § 3742(e). The burden of proof is on the government to establish by a preponderance of the evidence the factual predicate for increasing the defendant's offense level by taking relevant conduct into consideration. See Richards, 27 F.3d at 468 (in drug case, burden is on the prosecution to prove the existence of additional quantities by a preponderance of the evidence for those quantities to be considered as relevant conduct).

Section 1B1.3 of the Guidelines provides the controlling principles. As applicable here, this section provides that the "specific offense characteristics" used in setting the offense level

shall be determined on the basis of the following:

(1)(A)  all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B)  in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense[.]

10

USSG § 1B1.3(a)(1).

The limiting language of the last clause of this subsection would not permit the use of the Translumber scheme as relevant conduct since that transaction had nothing to do with the "offense of conviction," but that limiting language does not apply here. Instead, the next paragraph of subsection 1B1.3(a) provides that "all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction" are to be considered in certain cases, those being "offenses of a character for which § 3D1.2(d) would require grouping of multiple counts." USSG § 1B1.3(a)(2). Wire fraud (USSG § 2F1.1) and money laundering (§ 2S1.2) are offenses for which grouping of multiple counts is required under § 3D1.2(d).

Thus, for the Translumber scheme to have been properly included as relevant conduct, that scheme must have been part of a "common scheme or plan" with the offense of conviction, and defendant must have been accountable under one of the subdivisions of § 1B1.3(a)(1), quoted *supra*. Commentary to this provision supplies this clarification of what is meant by a common scheme or plan: "For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*." USSG § 1B1.3, comment. (n. 9).

The district court found that the Translumber scheme constituted a jointly undertaken common scheme or plan as defined by § 1B1.3(a)(1)(B), *supra*, based on findings that the

11

Translumber scheme and the scheme to defraud the German citizen, to which defendant had pleaded guilty, involved a common bank account, common accomplices, a common purpose, and a similar *modus operandi*. We see no error in these findings, which were based on the testimony of Agent Shriver. Agent Shriver testified that the documents from the files of the office of ICFG reflected that the Translumber scheme was conducted in "basically exactly" the same manner as the scheme with the German victim. VI R. at 14. A letter from ICFG, signed by "Mark Devenport" (a name which Shriver testified was used by co-defendant Sensi) to Translumber purporting to verify a contract in the amount of $18,500,000 and requesting payment of cable and communications charges, used language "almost exact[ly]" the same as that used in a letter to Mr. Woschny as part of the charged scheme. *Id.* at 17-18. Not only was the $25,000 received by defendant at the same Boatmen's account as was used in the charged offense, but defendant immediately wired a portion of this sum, $11,500, to London for the account of Mr. Roda, which corresponded to one of the wire transfers he made of the funds from the German victim. Shriver also testified, as discussed *supra*, regarding defendant's role in setting up the office of ICFG.

Defendant does not specifically dispute any of these findings, except that concerning defendant's role in setting up the ICFG office, and we have already concluded that the district judge's resolution of that issue adversely to him was not clearly erroneous. Instead, defendant's argument on this issue relies heavily, almost exclusively, on United States v. Custodio, 39 F.3d 1121 (10th Cir. 1994). That case concerned a physician who had been

12

convicted of making false claims to the government. The convictions were for claims made for services that the doctor had not performed. At sentencing, the government argued that other claims, involving a procedure called "unbundling," should be included as relevant conduct. "Unbundling" referred to a practice in which an entire procedure was billed as a unit, and subsidiary procedures which were included in the general unit were also billed separately, resulting in double billing for those procedures. For example, a charge for services performed for delivery of a baby might include a charge for performing a physical examination; if the examination was also billed separately, double billing would result. 39 F.3d at 1123 n. 5. The district court rejected the government's argument and found that the unbundling was not the same type of conduct and not the same scheme or plan as the charged conduct. We affirmed. Id. at 1126. We echoed the district court's concern that defenses could have been presented had the unbundling been charged.

Defendant contends his case is similar in that the government did not prove that the Translumber transaction was part of the same scheme or plan and that there "were certainly defenses which could have been presented" to rebut the allegations against him regarding the Translumber matter. We are not persuaded. We hold that the district court's findings of common accomplices, common purpose, and a common *modus operandi* are not clearly erroneous.

We also disagree with defendant's contention that the government presented no evidence that Mr. Philips engaged in a conspiracy to defraud Translumber. In addition to the

13

very strong similarities between the two schemes, there was evidence of defendant's role in setting up the New York office used to carry out both schemes and of his very frequent telephone communications with the co-conspirators during the relevant time. As to the possibility that he could have presented defenses to these allegations, we conclude that this alone cannot be sufficient to compel a finding that uncharged acts are not relevant conduct for sentencing purposes. First, defendant is not, of course, deprived of the opportunity to present defenses to these allegations but instead has a right to present evidence at the sentencing hearing. Second, we are convinced that the Custodio language was not intended to be, and must not be, construed as precluding a finding that uncharged acts constitute relevant conduct under the Guidelines whenever defenses could be raised to the allegations. Obviously, defenses could be raised to any allegations; therefore to read Custodio as defendant suggests would nullify an important part of the Guidelines structure. Clearly, Custodio must be read as expressing special concern about the particular circumstances presented there.

We find no error and no abuse of discretion in the district court's findings regarding relevant conduct.

## IV

We turn next to defendant's contention that his offense level should have been decreased by three levels for acceptance of responsibility instead of the two-level reduction which was recommended by the PSR and granted by the district judge. The issue whether

14

defendant accepted responsibility is a factual one reviewed under the clearly erroneous standard. United States v. McCollom, 12 F.3d 968, 972 (10th Cir. 1993). The determination of the sentencing judge is entitled to great deference on review. Id.; USSG § 3E1.1, comment. (n. 5). The burden of proof is on the defendant to establish that he has accepted responsibility. Id.

The district judge reduced defendant's offense level by two pursuant to USSG § 3E1.1(a), which permits the reduction if "the defendant clearly demonstrates acceptance of responsibility for his offense . . . ." Defendant sought a further decrease under subsection (b) of that section, which provides:

> If the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level 16 or greater, and the defendant has assisted authorities in the investigation or prosecution of his own misconduct by taking one or more of the following steps:
>
> (1)   timely providing complete information to the government concerning his own involvement in the offense; or
>
> (2)   timely notifying authorities of his intention to enter a plea of  guilty, thereby permitting the government to avoid preparing for      t r i a l  a n d permitting the court to allocate its resources efficiently,
>
> decrease the offense level by 1 additional level.

USSG § 3E1.1(b). Defendant makes no claim that he was entitled to a reduction for timely providing complete information concerning his involvement in the offense, but relies solely on the contention that he timely notified authorities of his intention to plead guilty and thereby permitted the government to cancel international travel arrangements it had made to

15

bring witnesses to the trial.

The district court found, however, that defendant was offered a chance to enter a guilty plea shortly after his arrest and chose not to do so until almost a year had passed. During this time, the court found, the government had begun trial preparations and had made extensive travel arrangements. The court found that defendant was not entitled to the additional one-level adjustment.

On appeal, defendant argues that he timely accepted a plea agreement which had been offered only a few days before the scheduled trial date. This assertion in his brief provides no basis, however, for us to conclude that the district judge erred in finding that he had the opportunity to enter a plea shortly after his arrest. Defendant further asserts that he entered his plea on the deadline set by the government, a deadline which apparently was set because of the extensive travel arrangements for witnesses which were made in anticipation of trial. Defendant points out that the government sought several postponements of the trial date to continue its investigation and its efforts to apprehend the other co-conspirators. He contends that the government was forced to begin trial preparations early because of the nature of the case, not because of the timing of his plea.

We are not convinced that the district judge was in error in finding that the defendant's delay caused the government to expend time and resources in making travel arrangements and other preparations. We note that the reduction Philips seeks is generally reserved for defendants who accept responsibility "particularly early in the case." USSG §

3E1.1, comment. (n. 6). We think the judge was well within his discretion to deny the additional one-point reduction. See United States v. Robinson, 14 F.3d 1200, 1203 (7th Cir. 1994) (defendant who entered guilty plea four to seven days before trial was not entitled to the one-level reduction).

## V

Finally, we consider Philips' argument that the district court erred in determining his offense level under USSG § 1B1.2(d) by considering his conviction of conspiracy to commit wire fraud and money laundering as if he had been convicted of two separate conspiracies involving the two object offenses.[2] The district judge found that, if he had been sitting as the trier of fact, he would have found defendant guilty of conspiring to commit both wire fraud and money laundering. Following our decisions in United States v. Smith, 13 F.3d 1421, 1428 (10th Cir.), cert. denied, 115 S.Ct. 209 (1994), and United States v. Johnson, 971 F.2d 562, 576 (10th Cir. 1992), the district judge concluded that money laundering and wire fraud are not offenses which can be grouped under USSG § 3D1.2, and accordingly the conspiracy charge was properly considered as separate conspiracies to commit both offenses under USSG § 1B1.2(d). The judge thus followed the PSR's recommendation of increasing defendant's offense level by one.[3]

---

[2]Section 1B1.2(d) provides: "A conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit."

[3]The Guidelines analysis is as follows: Under § 1B1.2(d), the conspiracy is treated
(continued...)

17

As with the previous Guidelines issues, we review the district court's interpretation of the guidelines *de novo* and its findings of fact under the clearly erroneous standard. The issue whether these counts should have been grouped under USSG § 3D1.2 is primarily a legal one subject to plenary review. United States v. Kunzman, 54 F.3d 1522, 1531 (10th Cir. 1995); Johnson, 971 F.2d at 575. We find no error in the district court's findings and conclusions on this issue.

Defendant's argument begins with reference to the Sentencing Commission's *caveat* regarding treating a conspiracy to commit more than one crime as separate counts of conspiracy to commit each offense under § 1B1.2(d). The Commission advises that:

> Particular care must be taken in applying subsection (d) because there are cases in which the verdict or plea does not establish which offense(s) was the object of the conspiracy. In such cases, subsection (d) should only be applied with respect to an object offense alleged in the conspiracy count if the court, were it sitting as a trier of fact, would convict the defendant of conspiring to commit that object offense. Note, however, if the object offenses specified in the conspiracy count would be grouped together under § 3D1.2(d) (*e.g.*, a conspiracy to steal three government checks) it is not necessary to engage in the foregoing analysis, because § 1B1.3(a)(2) governs consideration of the defendant's conduct.

---

[3](...continued)
as two separate conspiracies, one to commit wire fraud and one to commit money laundering. Consequently § 3D1.1, which sets out the procedure for determining the offense level on multiple counts, is applicable. Subsection (a)(3) of that section directs that the rules of § 3D1.4 are to be applied to determine the combined offense level. Application of that section resulted in a total of 1½ "units," which requires that the offense level for the "count" with the higher offense level, in this case the money laundering "count" with an adjusted offense level of 20, be increased by one. Philips does not challenge the calculation of his offense level on any grounds other than those we address herein.

18

USSG § 1B1.2(d), comment. (n. 5).  As we have already noted, however, the district judge did specifically find that he would, if sitting as trier of fact, have found Philips guilty of conspiracy to commit wire fraud and conspiracy to commit money laundering.  Defendant does not challenge this finding on appeal, which leaves only a legal argument that we find unconvincing.

Defendant argues that the object of the conspiracy was the wire fraud and that the disbursement of the proceeds, which constituted the money laundering violation under 18 U.S.C. § 1957(a),[4] "was a natural and necessary afterthought."  In essence, defendant argues that only one crime occurred because the wire fraud and money laundering were so closely connected as to be one "continuous" crime.  This argument is simply untenable in light of our prior holdings.

Whether the "object" offenses of this conspiracy -- wire fraud and money laundering -- are properly considered as separate offenses for sentencing purposes is, as the above

---

[4]Section 1957(a) provides:

>   Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b).

There is no dispute that the circumstances of the instant case bring it within subsection (d), which limits the territorial application of the statute.  Likewise, there is no dispute that the wire fraud scheme comes within the meaning of "specified unlawful activity," which is defined by cross-reference to 18 U.S.C. § 1956.

quoted comment suggests, dependent at least in large part on whether the underlying offenses are subject to being grouped under USSG § 3D1.2. That section provides for grouping of offenses "involving substantially the same harm." We have held that money laundering and fraud do not involve substantially the same harm and so are not subject to grouping because, at least in the circumstances we have encountered, these offenses involve different victims, the victim in money laundering being society as a whole. Johnson, 971 F.2d at 576; Kunzman, 54 F.3d at 1531; Smith, 13 F.3d at 1428.[5] We have also found, in circumstances similar to those presented here, that there is a temporal distinction between the offenses. See, e.g., United States v. Kennedy, 64 F.3d 1465, 1477-78 (10th Cir. 1995). In Kennedy, we noted our prior holding in United States v. Edgmon, 952 F.2d 1206,-1213-14 (10th Cir. 1991), cert. denied, 505 U.S. 1223 (1992), that "Congress clearly intended the money laundering statutes to punish new conduct that occurs after the completion of certain criminal activity, rather than simply as additional punishment for that criminal activity." 64 F.3d at

---

[5]We are aware that other circuits have, at least in some circumstances, held otherwise. In particular, in circumstances in which the transactions on which the money laundering counts were based were integral to a fraudulent or dishonest scheme, in the sense that the "laundered" funds were used to sustain an ongoing fraud, some courts have held that the victims of the fraud and the money laundering are the same and that grouping under § 3D1.2 is proper. E.g., United States v. Mullens, 65 F.3d 1560, 1564 (11th Cir. 1995), cert. denied, 116 S.Ct. 1337 (1996); United States v. Leonard, 61 F.3d 1181, 1185-86 (5th Cir. 1995); United States v. Cusumano, 943 F.2d 305, 312 (3d Cir. 1991), cert. denied, 502 U.S. 1036 (1992). We need not consider whether our holdings in Johnson and its progeny would preclude such a result in our circuit under such a factual scenario, as the facts in this case are much more closely analogous to those in our Johnson line of cases.

1478.[6] Accordingly, the monetary transfers in that case which were made after completion of the fraud offense were properly regarded as subsequent and distinct transactions. Similarly, in this case the conduct which constituted money laundering occurred after the wire fraud had been completed and so must be regarded as distinct from the wire fraud offense. Thus, Philips' argument is unconvincing.

We find that this case is similar to, and controlled by United States v Johnson, 971 F.2d at 575-76, where we held that wire fraud and money laundering may not be grouped under subsection (d) of § 3D1.2. We have reached the same conclusion in several other cases under similar circumstances and have rejected arguments which relied on other provisions of § 3D1.2 to distinguish Johnson  In United States v Smith, 13 F.3d at 1428-29, we held that these two offenses may not be grouped under subsection (c).  And in United States v. Kunzman, 54 F.3d 1522, 1530-31 (10th Cir. 1995), we held that these two offenses may not be grouped under subsection (b).[7]  We decline defendant's invitation to revisit Johnson in light of the particular facts of this case. Therefore, we find no abuse of discretion in the district court's application of the Guidelines to increase defendant's offense level under these

---

[6]We have noted, however, that we "could envision scenarios where money laundering and the underlying illegal activity occur simultaneously." United States v. Dimeck, 24 F.3d 1239, 1246 n. 12 (10th Cir. 1994)

[7]Our analysis in part III, *supra*, involves grouping under this Guidelines provision not of wire fraud and mail fraud, but of the wire fraud conspiracy to which defendant pleaded guilty and the uncharged wire fraud of the Dutch company, Translumber.  Similarly, the money laundering "count" to which defendant pleaded guilty is grouped with the money laundering in the Translumber scheme for purposes of that analysis.  The issue discussed in Part V is distinct.

provisions.

## VI

Having carefully reviewed all of defendant's claims of error, and concluding that they have no merit, we **AFFIRM**.

Entered for the Court


William J. Holloway, Jr.
Circuit Judge