**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**May 31, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

No. 06-6111

LEROY ERIC ALLEN,

Defendant-Appellant.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. NO. CR-05-158-T)**

Paul Antonio Lacy, Assistant Federal Public Defender, Oklahoma City, Oklahoma, for the Defendant-Appellant.

John C. Richter, United States Attorney, Oklahoma City, Oklahoma, for the Plaintiff-Appellee.

Before **O'BRIEN**, **HOLLOWAY**, and **McCONNELL**, Circuit Judges.

**McCONNELL**, Circuit Judge.

Leroy Eric Allen pleaded guilty to a single count of possession of methamphetamine with intent to distribute. That crime carries a statutory minimum punishment of ten years imprisonment and a maximum of life. The district court sentenced Mr. Allen to 360 months imprisonment, which is more

than two-and-a-half times the top end of the Sentencing Guidelines' recommended range. The district court based its sentencing decision on certain extreme facts that came to light during the investigation of Mr. Allen—namely, his professed desire to rape and murder young girls and the possible steps he took toward achieving those ends. Indeed, the district court gave Mr. Allen the sentence he would have received had he been convicted by a jury of solicitation of murder or attempted sexual abuse and abduction of a child. We hold that, although the sentencing court may consider Mr. Allen's unrelated, non-charged conduct in fashioning a sentence, the magnitude of the variance in this case and the way it was calculated were unreasonable. We therefore vacate the sentence and remand for resentencing.

## I. BACKGROUND

### A. The Investigation

This highly disturbing case began on May 27, 2005, when Leroy Eric Allen visited an Oklahoma City establishment featuring adult entertainment. There, he befriended one of the club's dancers, whom we will call "Ms. A," and the two made plans to meet at his apartment later that evening. Her visit lasted several hours, during which time the pair engaged in a wide-ranging discussion that culminated in an exchange about Mr. Allen's sexual proclivities. Mr. Allen described in graphic detail his preference for "younger kids"—girls as young as eight-years-old—and his desire to kidnap, rape, and murder them. R. Vol. III, at

16, 30–32. As Ms. A recalled during an evidentiary hearing before the district court:

> He said that he would want me to help him, maybe, kidnap a girl, and he said that he would like to get ahold of a child and—or a young girl and kidnap her, rape her, and then, when he was done with her, he wanted to put a bag over her head and watch her breathe in and out, and he—he wanted to see the moisture on her lips and the bag, and everything, and watch her eyes bulge out.

R. Vol. III, at 16–17. Frightened by this turn in the conversation, Ms. A soon left the apartment. She testified that Mr. Allen was, by this point in the evening, naked.

Over the course of the next few days, the two had a brief meeting at the adult entertainment establishment and conversed by telephone. During these conversations Mr. Allen reaffirmed his desire to have Ms. A assist him in sexually assaulting and murdering a young girl. Alarmed by the level of detail in Mr. Allen's descriptions and persuaded that his desires went beyond the bravado typically demonstrated by men who shared their sexual fantasies with her, Ms. A contacted the FBI and reported what had taken place.

The FBI conducted a background check on Mr. Allen and discovered that in 1987 he had been arrested by Oklahoma authorities for kidnaping and raping a fifteen-year-old girl, a crime that ultimately led to a conviction for rape. Mr. Allen's presentence report provides the following details:

> According to the Information and the Affidavit in this case, the defendant put a knife to the 15[-]year[-]old female victim's throat

and pulled her into his apartment. He then forced her into the bedroom where he vaginally raped her. Count 1 was reduced from Rape I to Rape II as part of a plea agreement and a second count of kidnapping was dismissed.

R. Vol. V, at 9. This history, combined with Ms. A's descriptions of her interactions with Mr. Allen, prompted the Bureau to commence a comprehensive investigation of Mr. Allen.

For six to eight weeks, beginning in early June 2005, the FBI surveilled Mr. Allen twenty-four hours a day, seven days a week. The surveillance failed to uncover any nefarious activity by Mr. Allen, other than his conversations with Ms. A. As the investigation rolled on with nothing to show for it, and resource constraints mounted, the Bureau scaled back this surveillance to four to five days a week.

The FBI also provided Ms. A with a tape recorder and asked her to record all further conversations with Mr. Allen. On June 2, 2005, Ms. A recorded a conversation she had with Mr. Allen at the adult entertainment establishment where she was employed. Mr. Allen reiterated his request for Ms. A's assistance in a kidnaping, and told her that he would like to target another dancer at the bar who had two younger daughters. Mr. Allen also told Ms. A that he had recently had sexual intercourse with a thirteen-year-old girl. There was no other evidence that this took place in reality.

In the early morning hours of June 4, Ms. A again met Mr. Allen at his apartment, and recorded the ensuing conversation. Mr. Allen came to the door naked and escorted her to his bedroom. They reclined on his bed, and Mr. Allen again began discussing kidnaping and murdering a pre-teen girl. As the district court described the conversation:

> Defendant's recorded words further detail his plan, including: when ("very soon too, but we just have to be careful"); the victim's age ("eight to ten" because he "would want them to know what's going to happen"); the kidnaping ("have 'em for a couple of days"); the killing ("don't want it to be quick;" a gunshot would be "just too fast;" strangulation "doesn't have to" be fast); the place ("have to pick" one); and disposal of the body ("one of the most thought about details of the whole thing;" "as long as nobody ever says anything . . . it'll never be found").

R. Vol. I, Doc. 34, at 3–4. Toward the end of this conversation, Mr. Allen began masturbating and Ms. A asked him if he was "[j]ust gettin [sic] turned on by the thought." Add. to Br. of Appellee, Ex. 1, at 5; R. Vol. III, at 24–25. The recording does not clearly reproduce his response.

Ms. A testified that at some point in the days following this encounter, Mr. Allen left her a phone message to the effect that if she refused to engage in oral sex with him, he did not want her calling him anymore. The FBI, by now concerned that her further involvement with Mr. Allen posed a safety risk, also instructed Ms. A to cease communicating with Mr. Allen. With Ms. A's participation at an end, the FBI continued its intensive surveillance of Mr. Allen.

That surveillance failed to reveal any further attempts on Mr. Allen's part to carry out the acts he had described to Ms. A.

At some point in June, the FBI contacted the Oklahoma City Police Department ("OCPD") to determine whether there were any unsolved child abduction cases in the area that might be linked to Mr. Allen. One, in fact, did exist. On April 2, 2005, a ten-year-old girl entered the video-game area of an Oklahoma City Wal-Mart while her mother checked out. A man approached the girl and asked if she liked men in masks. When the girl expressed confusion, the man asked whether she liked professional wrestlers. The girl looked toward two nearby Wal-Mart employees, and the man said: "Don't look at them; they'll kill you." R. Vol. III, at 63. At this point, the mother noticed the interaction and approached her daughter. The man immediately fled the store.

After learning of this incident, and after establishing through surveillance that Mr. Allen did visit this Wal-Mart, the FBI provided the OCPD with his picture. The OCPD arranged two photo arrays, only one of which contained Mr. Allen's picture, and asked the mother if any of the men in the photographs resembled the man from the Wal-Mart incident. When the mother came to Mr. Allen's picture, which was contained in the second array she viewed, she immediately identified him as the man who was talking with her daughter, stating: "That's him. That's the guy." R. Vol. III, at 68. In response to a follow-up question from the police she said "she was 80-percent sure" that Mr. Allen was

the man from the incident. *Id.* These facts, combined with what the FBI already knew about Mr. Allen, served to increase the Bureau's concern about him.

In early July 2005, the FBI observed Mr. Allen moving out of his apartment complex. Upon interviewing the complex's management, the FBI learned that Mr. Allen had been evicted due to suspicion that he was peddling drugs from his apartment. On July 4, 2005, the FBI introduced an undercover agent into Mr. Allen's new apartment complex. The agent initially tried to pique Mr. Allen's interest in participating in sexual intercourse with minors, but none of his attempts were successful. At the evidentiary hearing, the FBI agent in charge of the Allen investigation testified as follows:

> Q. And that agent tried to engage Mr. Allen into traveling to Texas to have sex with minors; is that true?
> A. The—the agent spoke to Mr. Allen and told him that he was participating in sex with minors out of state.
> Q. Okay. Did Mr. Allen ever make any motions to go to Texas to engage in such activity?
> A. No.
> Q. And was anything with that undercover agent and child sexual abuse, did it ever come to fruition[?]
> A. No. When they talked, Mr. Allen would ask him how was your weekend, and they would—they would talk about—the agent made up a story about the weekend and stuff. He seemed interest[ed] and asked, you know, "Watch out; be careful," and that kind of stuff. But, other than that, no, sir.

R. Vol. III, at 55–56.

At this point, the FBI shifted the focus of its investigation to Mr. Allen's suspected illicit-narcotics activity. On July 7, 2005, the undercover agent had a

lengthy conversation with Mr. Allen, wherein Mr. Allen discussed high-quality methamphetamine production and his personal use of the substance. The agent asked about purchasing some, and Mr. Allen stated that he could sell him at least a quarter-ounce for $365.00. Mr. Allen later informed the agent that the production process had faltered and he could not deliver on the promise.

Between July 9 and July 28, Mr. Allen and the undercover agent engaged in numerous discussions about methamphetamine, and Mr. Allen repeatedly promised and then failed to supply the agent with the drug. On July 29, the agent pursued a new strategy and informed Mr. Allen that he could provide four ounces of high quality methamphetamine. Mr. Allen was willing, and, in a series of e-mails on August 2, he and the agent worked out an arrangement by which Mr. Allen would receive four ounces of methamphetamine at a value of $3,600.00, would sell them quickly to repay the debt, and would, in the meantime, pledge title to his motorcycle as collateral. On August 5, Mr. Allen provided the agent with the title to his motorcycle. He also showed the agent several small baggies of high quality methamphetamine and asked if the narcotics he would be receiving were of similar quality. The agent responded affirmatively and, later that day, provided Mr. Allen with the promised narcotics. As Mr. Allen inspected the drugs, FBI agents entered his apartment and arrested him.

During a subsequent search of Mr. Allen's apartment, the FBI discovered a set of scales containing a white powder residue, a syringe filled with an unknown

clear liquid, four empty syringes, several baggies containing residue, and a metal measuring spoon containing white residue. On his computer's hard drive the FBI discovered files containing photographs of missing-children posters and several stories Mr. Allen had written about raping young girls. One of the stories involved Ms. A and another dancer at the adult entertainment establishment and had a plotline similar to the scenes he had described to Ms. A.

## B. Guilty Plea and Sentencing

On September 6, 2005, a federal grand jury charged Mr. Allen with a single count of possession of fifty or more grams of methamphetamine with intent to distribute, a violation of 21 U.S.C. § 841(a)(1). On October 5, 2005, Mr. Allen, without entering into a plea agreement, pleaded guilty to this single count. He agreed only to the following facts: "On 8-5-05 I accepted delivery of over 50 grams of methamphetamine from an undercover agent. I possessed the methamphetamine with intent to distribute. This occurred in Oklahoma City[,] OK." R. Vol. I, Doc. 20, at 10.

A probation officer prepared a presentence report ("PSR") in December 2005. The "Offense Conduct" section of the report detailed the portion of the investigation relating to the narcotics charge. Another section, entitled "Offense Behavior Not Part of Relevant Conduct," detailed the portion of the investigation relating to potential sexual abuse and murder. The report advised that Mr. Allen should be held accountable for possession of 120 grams of methamphetamine, and

calculated his total offense level at 29, a score which included a three-point reduction for acceptance of responsibility. Mr. Allen received five criminal history points—three points for the 1987 rape conviction and two points for a 2004 conviction for driving under the influence of drugs—which translated into a Criminal History Category of III. Without the statutory mandatory minimum, Mr. Allen's Guidelines range would have been 108 to 135 months. Taking into account the statutory mandatory-minimum sentence of ten years imprisonment under 21 U.S.C. § 841(b)(1)(A), however, Mr. Allen's advisory Guidelines range was 120 to 135 months imprisonment. At the close of the report, the probation officer stated that he "has no information concerning the offense or the offender which would warrant a departure from the prescribed sentencing guidelines." R. Vol. V, at 15. The officer did recommend, however, imposing conditions upon supervised release relating to the treatment and management of sex offenders.

The government subsequently requested that the court consider an above-Guidelines sentence "based upon other uncharged conduct so severe in nature that a greater sentence is warranted in order to protect the public from further crimes of the defendant." R. Vol. I, Doc. 24, at 1. The government recounted the details of the Wal-Mart incident and Mr. Allen's conversations with Ms. A, and characterized the drug prosecution as "quite simply, the fastest way to take this dangerous man off the street." *Id*. at 2. The government noted that "[u]nder the Guidelines, § 4A1.3 permits a departure if the criminal history category

-10-

significantly underrepresents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit further crimes," and thus requested that the court depart upward two criminal history categories. *Id.* at 4–5. The government reasoned that if Mr. Allen had been convicted of solicitation of murder (the conduct with Ms. A) and attempted abduction (the Wal-Mart incident) he would have a Criminal History Category of IV and qualify for a sentencing range of 121 to 151 months imprisonment.[1] The government urged a sentence at the top of that range, 151 months. Alternatively, the government asked the court to simply exercise its *Booker* discretion and impose a sentence of 151 months.

Mr. Allen opposed this motion and objected to those portions of the PSR that described his interactions with Ms. A and to the recommendation for sex offender treatment upon supervised release.

On February 16, 2006, the district court held an evidentiary hearing to resolve Mr. Allen's objections. The government presented the testimony of Ms.

---

[1] The government's calculations were not correct. It erroneously assumed that Mr. Allen qualified for an initial Criminal History Category of II instead of III. Thus, accounting for the prior felonies of attempted abduction and solicitation of murder, if that is what they were—each of which merits three additional criminal history points—would qualify Mr. Allen for a sentencing range higher than the one recommended by the government in its motion. That is, if we add these six points to the three points for the 1987 rape conviction and the two points for the 2004 driving under the influence conviction, the result is a total of eleven points. This would qualify Mr. Allen for a Criminal History Category of V and a sentencing range of 140 to 175 months imprisonment. *See* U.S. Sentencing Guidelines Manual, Ch. 5, Pt. A (2004).

-11-

A, of the FBI agent in charge of the Allen investigation, and of the OCPD officer who arranged the photo array relating to the Wal-Mart incident. Mr. Allen cross-examined these witnesses but did not present any witnesses of his own. The FBI agent noted that the Oklahoma County district attorney was considering prosecuting Mr. Allen "for solicitation of murder and any other charge stemming from this investigation." R. Vol. III, at 51–52.

After this hearing, the district court, in a written order, held that the facts stated in the PSR had been proven by a preponderance of the evidence and would be considered in sentencing Mr. Allen. The court explained that these matters were "highly pertinent to the issue of Defendant's sentence, particularly in view of his past conviction of raping a fifteen-year-old girl by putting a knife to her throat and pulling her into his apartment." R. Vol. I, Doc. 34, at 1–2. The court further held that these facts:

> reflect the history and characteristics of Defendant and pertain to the statutory purposes of sentencing set forth in [18 U.S.C.] § 3553(a)(2), such as protection of the public from further crimes by Defendant and deterrence to criminal conduct. The Court also finds that the Sentencing Guidelines provide no particularly appropriate mechanism for an upward departure under these extraordinary and extreme facts. The applicable guideline range based on Defendant's offense and criminal history (120–135 months) is grossly inadequate and does not accurately reflect either Defendant's criminality or his propensity for violent crime involving adult and minor victims and sexual offenses. Rather, these extraordinary and extreme facts lend themselves to a district court's authority to deviate reasonably from the advisory Sentencing Guidelines to satisfy the goals of sentencing.

R. Vol. I, Doc. 34, at 4–5 (internal citation omitted). The district court also rejected Mr. Allen's objections to the inclusion of sex-offender release conditions and stated that it would include such conditions in his sentence.

Sentencing occurred on March 9, 2006. At the hearing, the government, without explanation, requested a longer sentence than the one it had previously recommended to the court in its motion. Instead of arguing that Mr. Allen's non-drug related conduct should be incorporated into his criminal history, the government now argued that this conduct should be punished in its own right, explaining that application of the sexual abuse provision of the Guidelines, § 2A3.1, would result in "a total offense level of 36, with a Criminal History Category of three, which would recommend a sentencing guideline range of 235 to 293 months." R. Vol. IV, at 77. Mr. Allen's counsel requested that the court "not deviate to any substantial degree," noting that Oklahoma authorities were considering prosecuting Mr. Allen for the other aspects of the investigation and that his "original guideline sentence began at a level less than the ten-year mandatory minimum stated in the presentence report." R. Vol. IV, at 78–79.

After hearing these arguments, the district court pronounced Mr. Allen's sentence.[2] The court concluded that the "advisory guideline range of less than twelve years in prison [was] vastly inadequate to satisfy the statutory purposes of

---

[2] The court issued both an oral ruling and a contemporaneous written order. The oral ruling essentially constitutes a paraphrasing of the written order, and we quote from the latter.

-13-

sentencing," R. Vol. I, Doc. 37 at 1, and found that the "unusual facts of this case plainly warrant an exercise of the Court's 'broad discretion to consider information concerning the defendant's life and characteristics, including conduct on which he ha[s] not been convicted,'" *id.* at 3 (quoting *United States v. Magallanez*, 408 F.3d 672, 684 (10th Cir. 2005)). Citing both Mr. Allen's interactions with Ms. A and the Wal-Mart incident, the court reiterated that it had found, by a preponderance of the evidence, that "in 2005 Defendant was actively planning and taking steps to accomplish a number of violent, sexual crimes against females and children." *Id.* at 3. The court was convinced of "the severity of [Mr. Allen's] threat to the community, and found no basis to question the seriousness of [his] criminal and violent intentions. In fact, his criminal history confirm[ed] his ability to act on his violent sexual desires." *Id.* at 5–6.

The district court concluded that because "the Sentencing Guidelines provide no particularly appropriate mechanism for an upward departure under these extraordinary facts, [it] must go outside the guideline range," taking guidance from the § 3553(a) factors and *Booker*'s "standard of reasonableness." *Id.* at 3. Turning to these factors, the court reasoned as follows:

> Two of the statutory factors . . . cause grave concern: the need for the sentence imposed (1) to protect the public from further crimes of Defendant and (2) to provide adequate deterrence to criminal conduct by others. Defendant's degree of dangerousness and the nature and seriousness of his threatened conduct demand a severe sentence in order to serve these dual purposes. In addition, in view of the similarity between his past conviction of the violent rape of a fifteen-

year-old girl and his recent actions, the Court finds a high likelihood of recidivism; indeed, the evidence established not only Defendant's propensity but his actual determined efforts toward recidivism. . . . Defendant's penchant for targeting children and inflicting cruel fear and torture as a form of personal sport or sexual pleasure warrants even greater reprobation.

*Id.* at 6. The court imposed a sentence of 360 months imprisonment as "reasonable, necessary, and minimally sufficient to satisfy the incapacitative and deterrent goals of sentencing." *Id.* at 6–7.

Despite its earlier statement that the Guidelines provided "no . . . mechanism" to compute an appropriate sentence, *id.* at 3, the court "recognize[d] its duty to consult [them]," and thus "searched the Sentencing Guidelines for guidance," proceeding as follows:

> It appears the most closely analogous basis for an upward departure lies in § 5K2.21, entitled "Dismissed and Uncharged Conduct." This provision permits a sentencing court to depart upward "based on conduct (1) . . . underlying a potential charge not pursued in the case as part of a plea agreement *or for any other reason*; and (2) that did not enter into the determination of the applicable guideline range." U.S. Sentencing Guidelines Manual § 5K2.21 (emphasis added). The facts stated above, viewed under a preponderance of the evidence standard, establish conduct underlying a potential charge of attempt or solicitation to commit aggravated sexual abuse or first-degree murder. Considering the guideline provisions for such offenses based on the conduct shown by the evidence and Defendant's criminal history would yield an advisory guideline range of 360 months to life, calculated as follows.
>      For criminal sexual abuse or attempt to commit criminal sexual abuse, the applicable guideline section is 2A3.1. The base level is 30 and the specific offense characteristics would warrant increases for: (a) aggravated conduct (using force and placing the victim in fear of death, serious bodily injury or death), 4 levels; (b) the age of the victim (under twelve years), 4 levels; (c) life-threatening bodily

injury to the victim, 4 levels; and (d) abduction of the victim, 4 levels. The adjusted offense level under Section 2A3.1 is 46. If the victim was murdered, the cross-reference requires the application of Section 2A1.1 if a greater offense level results. Section 2A1.1 provides a base offense level of 43. However, Section 2X1.1(b)(3) would require a decrease of 3 levels because it was a solicitation rather than a completed offense. Thus the total offense level for uncharged conduct would be at least 40. With Defendant's criminal history category of III, the Sentencing Table yields a recommended guideline range for offense level 40 of 360 months to life. Thus viewing the Sentencing Guidelines as an objective marker, this analysis confirms the reasonableness of the sentence determined by the Court based solely on the sentencing factors and its reasoned judgment as a sentencing court.

*Id.* at 7–8 (omission in original).

Mr. Allen appeals his sentence on the ground of substantive unreasonableness under *Booker*. He also contends the sentence violates the Eighth Amendment.[3] Because we vacate the sentence on reasonableness grounds, we do not reach his Eighth Amendment argument.

## II. DISCUSSION

Mr. Allen pleaded guilty to possession with intent to distribute methamphetamine. The statutory punishment range for this crime is broad: ten

---

[3] In his statement of facts, Mr. Allen also asserts that the "district court . . . imposed condition[s] of supervised release just as if [he] had been convicted of [] criminal sexual abuse." Appellant's Br. at 9–10. Mr. Allen does not return to the issue in the argument section of his brief and provides no legal authority in support of it. Thus, to the extent this lone phrase represents an argument against the imposition of these conditions, we decline to address it. *See United States v. Banks*, 451 F.3d 721, 728 (10th Cir. 2006) ("Mr. Banks provides no legal authority to support this argument; therefore, we decline to address it.").

years to life. In light of his criminal history—which includes the forcible rape of a minor female—as well as a congressionally imposed mandatory minimum based on drug quantity, *see* 21 U.S.C. § 841(b)(1)(A)(viii), the district court correctly calculated an advisory sentencing range of 120–135 months in prison.

The district court then sentenced Mr. Allen to 360 months imprisonment. This dramatic upward variance was based on the fact that, during the course of this investigation, Mr. Allen expressed a continued desire to sexually assault, rape, torture, and murder young girls, along with some evidence that he may have taken preliminary steps toward acting upon these desires. Reasonable minds may differ on just how to interpret this evidence, and the issue was not put to a jury. The defense presented a plausible argument that Mr. Allen was, like a twisted Walter Mitty, simply fantasizing. But the district court concluded that Mr. Allen actually desired and planned to commit these crimes and was taking steps toward doing so. Based on the record in this case, that conclusion was not clearly erroneous. And the district court's conclusions regarding Mr. Allen's proclivities undoubtedly bear a logical relation to the sentencing factors set forth in 18 U.S.C. § 3553(a), most especially the need to protect the public from further crimes of the defendant.

The question presented is whether it was reasonable for the district court effectively to sentence Mr. Allen as if he had been tried and convicted of

attempted criminal sexual abuse or solicitation of murder, when his crime of conviction was sale of methamphetamine.

## A. Standard of Review

Under our decision in *United States v. Kristl*, 437 F.3d 1050 (10th Cir. 2006), we follow a two-step approach in reviewing a district court's sentencing decision. First, we review the court's calculation of the defendant's Guidelines sentence, if challenged. *Id.* at 1054–55. Second, if the district court correctly determined that range, we review the actual sentence imposed for reasonableness. *Id.*; *United States v. Booker*, 543 U.S. 220, 261–62 (2005). Because Mr. Allen does not challenge the district court's calculation of his Guidelines range, we proceed directly to the second step of the *Kristl* inquiry.

Within-Guidelines sentences enjoy a presumption of reasonableness, *Kristl*, 437 F.3d at 1054, while sentences that fall outside of this range are reviewed on a "sliding scale," *United States v. Valtierra-Rojas*, 468 F.3d 1235, 1239 (10th Cir. 2006). We look to the "discrepancy between the advisory guidelines range and the actual sentence," *Cage*, 451 F.3d at 594, "in terms of *both* percentage *and* absolute time," *Valtierra-Rojas*, 468 F.3d at 1240. "The farther the [sentencing] court diverges from the advisory guideline range, the more compelling the reasons for the divergence must be." *Id.* at 1239 (internal quotation marks omitted). In *Cage*, the district court imposed a sentence of six days' imprisonment, a downward variance from the guidelines range of forty-six to fifty-seven months.

We characterized this variance as "extreme" and "reasonable only under dramatic facts." *Cage*, 451 F.3d at 594. In *Valtierra-Rojas*, we described the "thirty-three-month/122%" upward variance as "not nearly so extreme," but nevertheless treated it as a "substantial" variance requiring "compelling reasons." 468 F.3d at 1240. The variance here—225 months, or 167%—is more substantial than that in *Valtierra-Rojas*. We regard it as sufficiently extreme that it can be upheld only based upon a compelling justification.

**B. Consideration of this Sentence Under the Sentencing Guidelines**

The district court concluded that the Sentencing Guidelines provided "no . . . mechanism" to compute an appropriate sentence under the "extraordinary facts" of this case. R. Vol. I, Doc. 37, at 3. That is why it imposed an upward variance in the exercise of its *Booker* discretion. We begin our analysis of reasonableness with a discussion of why the Guidelines would not permit the court to impose this kind of sentence; we can then consider whether it was reasonable for the court, in its exercise of *Booker* discretion, to disregard the relevant limiting principles found in the Guidelines.

**1. Attempted Crimes Versus Threatened Future Conduct**

As a first step, we must consider how to interpret the evidence of Mr. Allen's non-drug-related conduct, which consisted of discussions with Ms. A and an encounter with a child in the Wal-Mart. These events can be viewed in two different ways. First, they may have been actual attempted criminal activity. Mr.

Allen's conversations with Ms. A may have constituted the crime of solicitation of murder and the Wal-Mart incident may have constituted the crimes of attempted abduction or attempted sexual abuse of a child. Portions of the district court's opinion suggest this attempted-crimes perspective. For example, the court outlined the "steps" Mr. Allen had already taken "to accomplish a number of violent, sexual crimes." *Id.* The court's sentencing calculation was based on the crime of criminal sexual abuse or attempt, with a four-level enhancement for aggravated conduct, a four-level enhancement for age of the victim, a four-level enhancement for life-threatening bodily injury to the victim, and a four-level enhancement for abduction of the victim. *Id.* at 7–8. The court also calculated the sentence for murder, with a three-point decrease in offense level because the conduct was solicitation rather than a completed homicide. *Id.* at 8. All this reads as if these crimes had already been committed.

Alternatively, Mr. Allen's statements and behavior may raise a concern about his potential future criminality. Portions of the district court's explanation suggest this future-crimes perspective. For example, the court discussed the "seriousness of his *threatened* conduct," *id.* at 6 (emphasis added), as well as his "propensity" and "penchant" for "targeting children and inflicting cruel fear and torture as a form of personal sport or sexual pleasure." *Id.*

This distinction has significance under the Guidelines because of the different ways in which related conduct, past crimes, and future dangerousness

are treated. Conduct related to the offense of conviction is treated as an offense characteristic, whereas past criminal convictions are generally treated as an offender characteristic, and taken into account by assigning a criminal history score. *See* Douglas A. Berman, *Conceptualizing* Blakely, 17 Fed. Sent'g Rep. 89, 89–90 (2004) (distinguishing between offense characteristics and offender characteristics). Future dangerousness also is an offender characteristic. Because evaluation of future dangerousness could otherwise veer into speculation, it generally is evaluated on the basis of the defendant's recidivism, which takes into account prior convictions and prior *similar* adult misconduct. United States Sentencing Guidelines Manual §§ 4A1.1, 4A.3.(a)(2)(E). To predicate a sentence on evidence that a defendant is likely to commit a particular crime in the future—based not upon past or similar crimes, but upon expressions of desire—takes us into uncharted waters. For the most part, we regard the district court's order as relying on uncharged, attempted criminal activity. Toward the end of the opinion, we consider the propriety of basing a sentence on threatened, but as yet not executed, crimes. Either way, reliance on this past or threatened future conduct is problematic.

### 2. Offense Characteristics

As Justice Breyer explained in *Booker*, "Congress' basic statutory goal—a system that diminished sentencing disparity—depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that

underlies the crime of conviction." 543 U.S. at 251. Accordingly, the first fundamental element of the Guidelines calculation is the assignment of a base offense level, which is calculated by accounting for "all acts and omissions committed . . . by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S. Sentencing Guidelines Manual § 1B1.3(a)(1) (2004). Known as relevant conduct, this comprises more, often much more, than the offense of conviction itself, and may include uncharged and even acquitted conduct. *See Magallanez*, 408 F.3d at 684. As stated in the commentary to the Guidelines, "[c]onduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range." U.S.S.G. § 1B1.3 cmt. background. But though relevant conduct includes more than just the conduct for which a defendant was convicted, it has limits: the conduct must relate to the offense of conviction. *See, e.g.*, *United States v. Asch*, 207 F.3d 1238, 1243 (10th Cir. 2000); *United States v. Custodio*, 39 F.3d 1121, 1126 (10th Cir. 1994); *United States v. Ortiz*, 431 F.3d 1035, 1040 (4th Cir. 2005); *United States v. Leonard*, 289 F.3d 984, 987–88 (7th Cir. 2002); *United States v. McGahee*, 257 F.3d 520, 532 (6th Cir. 2001); *United States v. Cross*, 121 F.3d 234, 238–39 (6th Cir. 1997); *United States v. Kim*, 896 F.2d 678, 682–84 (2d Cir. 1990).

The relatedness principle is fundamental because of our commitment to sentencing based on the seriousness of the *actual offense* proven or admitted. *See* 18 U.S.C. § 3553(a)(1) ("the nature and circumstances *of the offense*") (emphasis added); *id.* § 3553(a)(2)(A) ("the need for the sentence imposed . . . to reflect the seriousness *of the offense . . .*") (emphasis added); William W. Wilkins, Jr. & John R. Steer, *Relevant Conduct: The Cornerstone of the Federal Sentencing Guidelines*, 41 S.C. L. Rev. 495, 497–99 (1990). This is not unrelated to the Sixth Amendment principles underlying *Booker*. Most crimes include within their ambit a broad range of conduct. Depending upon the circumstances of its commission the same "crime" will have a different impact, reflect varying levels of culpability, or portend unlike consequences. When a sentencing court considers conduct related to the offense of conviction, the objective is to determine the seriousness of the very crime found by the jury or admitted by the defendant. If the considered conduct has nothing to do with the offense of conviction, the court is effectively sentencing a defendant for a crime that was never proved to the jury, or admitted by the defendant. To allow this would empower the government to obtain punishment for any number of unrelated crimes, based on bench trial rather than jury trial. The relatedness principle thus keeps the system from straying too far beyond the Sixth Amendment line.

In assessing whether conduct is sufficiently related to the offense of conviction, courts ask "whether there is a strong relationship between the

-23-

uncharged conduct and the convicted offense, focusing on whether the government has demonstrated a significant similarity, regularity, and temporal proximity." *Ortiz*, 431 F.3d at 1040 (internal quotation marks omitted); *see also United States v. Roederer*, 11 F.3d 973, 979 (10th Cir. 1993). For example, this Court has found that drugs possessed for a defendant's personal use were related to the defendant's drug manufacturing and distribution offenses because the quantity of drugs the defendant personally consumed was relevant to the total amount of illicit narcotics she received during the drug conspiracy. *Asch*, 207 F.3d at 1244. On the other hand, we have also held that certain forms of overbilling were not related to a doctor's offense of billing for services he did not perform. *Custodio*, 39 F.3d at 1126. The *Custodio* Court explained that the government had not proven the overbilling practices were "the same type of conduct" or part of "the same scheme or plan" as the offense of conviction, and noted that if the overbilling had been charged, the defendant might have had viable defenses, such as mistake or misunderstanding. *Id.* In a particularly striking case, the Sixth Circuit reversed a § 1B1.3 enhancement where the defendant pled guilty to distribution of cocaine. *Cross*, 121 F.3d at 240–41. The district court applied an upward enhancement based on evidence that the defendant had participated in the gruesome torture of a former confederate suspected of stealing drugs. Because the appellate court concluded that there was

an insufficient connection between the torture and the defendant's cocaine sale, it reversed the enhanced sentence. *Cross*, 121 F.3d at 238–41.

In this case, the district court correctly concluded—and the government does not contest—that the horrific sexual abuse or murder that Mr. Allen either contemplated or took steps toward committing was not relevant conduct because it was completely unrelated to his sale of methamphetamine. Although the two forms of criminality occurred during the same time frame, there is no other connection between them. The Wal-Mart incident and Mr. Allen's discussions with Ms. A did not occur in preparation for the methamphetamine sale, during the execution of the sale, or in the course of avoiding responsibility for the sale. *See* U.S.S.G. § 1B1.3(a)(1). This case thus bears a close resemblance to *Cross*, except that in *Cross* the torture actually occurred, and the torture and the drug offense were more arguably connected. We conclude that Mr. Allen's uncharged activities, whether threatened or attempted, did not constitute relevant conduct under § 1B1.3 of the Guideline. To the extent that the district court used the uncharged conduct in this case as an offense characteristic, which is not clear, it violated a basic structural norm of the Guidelines system.

**3. Criminal History**

The second fundamental element of the Guidelines calculus is based on an *offender characteristic*, namely criminal history. In this context, prior acts that are not related to the offense of conviction may be considered because a

"defendant's prior record of past criminal conduct is directly relevant to" the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2). U.S.S.G. § 4A intro. cmt. "A defendant with a record of prior criminal behavior is more culpable than a first offender and thus deserving of greater punishment." *Id.*

Criminal history points are assigned for prior crimes only when the defendant was previously tried and convicted of the offense. *See* U.S.S.G. §§ 4A1.1, 4A1.2. Each of the criminal history categories is defined according to the defendant's "prior sentence," which in turn is defined as "any sentence previously imposed upon adjudication of guilt . . . for conduct not part of the instant offense." *Id.* § 4A1.2(a)(1). This limitation, like the relatedness rule for relevant conduct, has Sixth Amendment implications: criminal history points are assigned only on the basis of prior convictions by a jury or pleas of guilty or nolo contendere. A sentencing judge cannot impose additional punishment pursuant to criminal history without a "jury . . . stand[ing] between the individual and the power of the government." *Booker*, 543 U.S. at 237. Mr. Allen's non-drug related conduct therefore could not count toward his criminal history without violating a second fundamental structural feature of the Guidelines, which limits criminal history to misconduct that was formally adjudicated, with Sixth Amendment safeguards.

### 4. Upward Departures Under the Guidelines

Nor could the district court have departed upward under the Guidelines on the basis of these facts. Under § 5K2.0, a court can depart from "the applicable guideline range based on offense characteristics or offender characteristics of a kind, or to a degree, not adequately taken into consideration in determining that range." U.S.S.G. § 5K2.0 cmt. n.2(A).[4] But like enhancements for uncharged conduct under § 1B1.3, when a § 5K2.0 departure is based on "'acts of misconduct not resulting in conviction'" those acts must still "'relate meaningfully to the offense of conviction.'" *United States v. Neal*, 249 F.3d 1251, 1260 (10th Cir. 2001) (quoting *United States v. Amirault*, 224 F.3d 9, 12 (1st Cir. 2000); *see also United States v. Haggerty*, 4 F.3d 901, 903 n.2 (10th Cir. 1993) ("[I]f we were presented with a case where a district court departed based upon a totally irrelevant circumstance, we would not hold such a departure authorized merely because the circumstance was of a kind omitted by the Guidelines."); *Cross*, 121 F.3d at 240; *Kim*, 896 F.2d at 684. Section 5K2.0 was therefore unavailable in this case.

The Guidelines also recognize that the criminal history scoring system will sometimes underrepresent (or overrepresent) the seriousness of an offender's

---

[4] Section 5K2.0 is not applicable to departures pursuant to other guidelines, such as underrepresentation of criminal history. U.S.S.G. § 5K2.0 cmt. n.2(B). Neither criminal history nor underrepresentation of criminal history is limited to crimes related to the crime of conviction.

criminal past. Section 4A1.3(a)(1) therefore provides that "[i]f reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, an upward departure may be warranted." One might argue that Mr. Allen's statements and behavior during this investigation render his criminal history, and in particular his past conviction for forcible rape of a fifteen-year-old girl, more ominous, and thus that a departure would be warranted under this section. That, presumably, is why the government initially proposed to the court an upward departure of two criminal history categories.

But there are problems with this approach. In the 2004 Guidelines Manual, § 4A1.3(a)(2) reads as follows:

> The information described in subsection (a) may include information concerning the following:
>     (A) Prior sentence(s) not used in computing the criminal history category (*e.g.*, sentences for foreign and tribal offenses).
>     (B) Prior sentence(s) of substantially more than one year imposed as a result of independent crimes committed on different occasions.
>     (C) Prior similar misconduct established by a civil adjudication or by a failure to comply with an administrative order.
>     (D) Whether the defendant was pending trial or sentencing on another charge at the time of the instant offense.
>     (E) Prior similar adult criminal conduct not resulting in a criminal conviction.

U.S. Sentencing Guidelines Manual § 4A1.3(a)(2) (2004). It does not appear that

Mr. Allen's uncharged conduct falls into any of these categories.[5] All prior

convictions may be considered, but only *similar* adult criminal conduct. His

perverse sexual desires and putative acts in furtherance of them are distinctly

dissimilar from the crime of conviction.

Moreover, even assuming prior misconduct outside the categories listed in

§ 4A1.3 could be the basis for a departure for underrepresented criminal history,

such misconduct would still have to be considered and weighed in a manner

similar to that employed for acts of prior misconduct already contemplated by the

Guidelines, that is, as increasing the defendant's criminal history score, not his

offense level. *See* U.S. Sentencing Guidelines Manual § 4A1.3(a)(4) (2004);

*United States v. Thorton*, 922 F.2d 1490, 1494 (10th Cir. 1991) ("[T]he district

court erred in determining the degree of upward departure because it ignored the

distinction between offense level and criminal history category departures.

Thorton's prior uncharged criminal conduct reflects on the adequacy of her

---

[5] It may be significant that, prior to 2003, the Guidelines Manual expressly stated that a district court was "not limited to" the information in the five categories listed above. The Sentencing Commission dropped these words from the Manual in 2003 when it substantially amended §4A1.3 to comport with the PROTECT Act, which directed the Sentencing Commission to "substantially reduce[]" the incidence of downward departures. Pub. L. 108-21. Nothing in the commentary regarding this amendment suggests that the change was meant to transform the list into an exhaustive one, U.S.S.G. App. C, Vol. II, Am. 365, but the change in language might be read that way. Because the district court in this case did not justify the sentence as a departure under this provision, we need not resolve that issue today.

criminal history category, not the base offense level."); *United States v. Wittig*, 206 F. App'x 763, 771 (10th Cir. 2006) (unpublished) ("[W]e understand why Mr. Wittig's [current] sentence should reflect the criminal history established by his convictions in the [prior] Westar case; but we fail to understand why those convictions are otherwise relevant to the present case.").

Had Mr. Allen's non-drug-related conduct been worthy of a § 4A1.3 departure, as the government initially urged, the district court could have added two felonies to his record (assuming, as did the sentencing judge, that attempted sexual abuse and solicitation of murder were the crimes to be considered). As set out in the margin above, *see supra* note 1, this would have added six criminal history points to Mr. Allen's score, qualified him for a criminal history category of V, and resulted in a Guidelines sentencing range of 140 to 175 months. Mr. Allen's actual 360 month sentence obviously far exceeds the range that would have been applicable even if a departure were warranted.

## C. Exercise of *Booker* Discretion

The fact that Mr. Allen's sentence could not have been justified under the Guidelines does not, of course, mean that it is unreasonable. The district court did not purport to hew to the Guidelines in setting Mr. Allen's sentence, and as a result of the *Booker* decision, was not required to do so. We do not question, for example, that a sentencing court may vary upward or downward based on the court's own evaluation of the defendant's likelihood of recidivism or

-30-

reform—though we note that courts of appeals have regarded extreme variances on the basis of such factors unreasonable. *See, e.g.*, *United States v. Pyles*, ___ F.3d ___, 2007 WL 1063616, at *1–2, 7 (4th Cir. Apr. 11, 2007) (finding substantively unreasonable a district court's decision to vary downward from an advisory range of 63–78 months and impose no prison time based on the defendant's "substantial rehabilitation"); *United States v. Garate*, ___ F.3d ___, 2007 WL 967317, at *2–3 (8th Cir. Apr. 3, 2007) (concluding that the district court gave "undue weight" to defendant's age and to a study showing that younger perpetrators commit criminal acts due to cultural and environmental influences); *United States v. Perrin*, 478 F.3d 672, 678 (5th Cir. 2007) (vacating a downward variance and finding the defendant's "contrition and his commencement of counseling" to be "inappropriate grounds for imposing a non-guidelines sentence, because they are already accounted for in the reduction for acceptance of responsibility"); *United States v. Kane*, 470 F.3d 1277, 1281 (8th Cir. 2006) (vacating a 90-month downward variance and finding that the defendant's "rehabilitative efforts are not extraordinary and do not support a sentence reduction"). *See also United States v. Sindima*, 478 F.3d 467, 473 (2d Cir. 2007) (overturning an upward variance, based primarily on the need for deterrence, because the Guidelines already accounted for this factor); *United States v. Tucker*, 473 F.3d 556, 564–65 (4th Cir. 2007) (same).

We recognize that, after *Booker*, sentencing courts have some latitude to consider evidence and conduct beyond what would have been permissible under §§ 1B1.3, 4A1.3, and 5K2.0 in the course of determining whether the defendant's criminal history adequately reflects his dangerousness to the community. For example, this Court has upheld as reasonable an upward variance based on evidence of past misconduct (such as police records in connection with arrests) that did not result in conviction. *See United States v. Mateo*, 471 F.3d 1162, 1166–68 (10th Cir. 2006); *see generally Magallanez*, 408 F.3d at 684 (noting that "[n]o limitation" should "be placed on the information concerning the background, character, and conduct of a person . . . for the purpose of imposing an appropriate sentence.").

The question posed by this case, however, is not whether consideration of Mr. Allen's unrelated, unadjudicated, and dissimilar actions was improper, but whether the weight given to those actions was excessive. *See Cage*, 451 F.3d at 595 ("The problem with the sentencing decision . . . is not in the consideration of these factors; it is in the weight the district court placed on them."); *United States v. Morales-Uribe*, 470 F.3d 1282, 1286 (8th Cir. 2006) (noting that "while the district court considered appropriate factors in imposing the sentence, [it] committed a clear error of judgment in weighing these factors").

It might well have been reasonable for the district court to consider Mr. Allen's uncharged conduct as a factor bearing on offender characteristics, on

-32-

analogy to departures under § 4A1.3.  As noted above, that would lead to a

sentencing range of 140 to 175 months.  This is essentially the approach urged by

the government in its written motion to impose an above-guidelines sentence.  R.

Vol. I, Doc. 24.  Although this would stretch the categories of information

bearing on underrepresentation of criminal history beyond those listed in § 4A1.3,

it would remain faithful to the fundamental architecture of the Guidelines and

might therefore fall within the realm of *Booker* discretion.  Instead, however, the

district court essentially abandoned consideration of the advisory guidelines range

and substituted a calculation based explicitly on unrelated conduct with which

Mr. Allen had not been charged or convicted.

The district court concluded that "the nature and seriousness of [Mr.

Allen's] threatened conduct" necessitated a 360-month sentence.  R. Vol. I, Doc.

37, at 6.  The court "confirm[ed]" the necessity of this punishment by looking to

the sentence Mr. Allen would have received if he were actually charged for

additional crimes in a federal court and were convicted by a jury of his peers.  *Id.*

at 8.  As we explained above, the court at times seemed to be contemplating

crimes it felt were already completed and at times seemed to be forecasting what

Mr. Allen might do in the future.  Whichever it is, we think the district court

strayed from the path of reasonableness.  Even if it is reasonable to conclude that

a defendant who committed uncharged crimes or who presents a serious risk of

committing future crimes deserves greater punishment than a similarly-situated

defendant who committed no such other crimes and presents no such risk, it is quite another thing to conclude that the proper measure of that increase is the sentence that would be imposed had the defendant *actually been convicted* of those uncharged, unrelated crimes.

In *United States v. Wolfe*, 435 F.3d 1289 (10th Cir. 2006), the district court sentenced a defendant convicted of involuntary manslaughter as if he had been convicted of second-degree manslaughter with malice aforethought. *Id.* at 1294, 1304. This Court held that a "district court cannot simply depart upward 'based in actuality on the contention that the offense of conviction is more properly characterized as another, closely related offense.'" *Id.* at 1304 n.12 (quoting *United States v. Hanson*, 264 F.3d 988, 995 (2001)).[6] This case involves an even more extreme recharacterization of the offense: from methamphetamine distribution to attempted sexual abuse of a child or solicitation of murder. If it was error in *Wolfe* for the sentencing judge to elevate a conviction of manslaughter from one degree to another for purposes of sentencing, it follows *a fortiori* that a sentencing judge may not sentence a defendant for an entirely

---

[6] *Wolfe* involved a post-*Booker* review of a pre-*Booker* departure; but in light of the advisory character of the Guidelines after *Booker*, this Court stated that it was "informed by, and must take account of, the fact that the district court would have enhanced discretion upon remand after *Booker*.'" 435 F.3d at 1296 (quoting *United States v. Serrata*, 425 F.3d 886, 912 (10th Cir. 2005)). The principles relied on in *Wolfe* thus remain applicable to our review of a post-*Booker* sentencing decision.

different, and far more serious, crime.  As we previously recognized when the

Guidelines were still mandatory:

> To allow upward departure on the grounds that a second-degree
> murder was premeditated would permit the sentencing court to treat
> the offense of conviction (here, a murder that was not premeditated)
> as merely establishing a floor offense level.  "[E]ach sentencing
> court could depart upward based upon the 'real offense' [i.e., a
> premeditated murder] whenever the court wished."  Thomas W.
> Hutchison, David Yellen, Peter B. Hoffman & Deborah Young,
> *Federal Sentencing Law & Practice* § 2A1.2 comment. (f) (2000) . . .
> .  Such a result would allow substantially different sentences for the
> same crime, a result inconsistent with the a primary goal of the
> Guidelines—reducing unwarranted sentencing disparity.

*Hanson*, 264 F.3d at 996.  This principle still has force in the post-*Booker* world,

not just because it preserves a policy judgment inherent in the Guidelines—itself

an important factor under 18 U.S.C. §3553(a)(5)(A)—but also because it respects

the Sixth Amendment values underlying both *Booker* and the structural safeguards

of the Guidelines.

There remains the possibility that the district court based Mr. Allen's

sentence not on evidence that he actually committed the crimes of solicitation of

murder and attempted criminal sexual abuse, but on the prospect that he would

commit these crimes when he got the opportunity.  Moviegoers will recognize the

scenario from Minority Report, a film that depicts a world in which would-be

criminals are apprehended and punished for crimes they are predicted to commit,

before they have the chance actually to commit them.[7]  However effective this approach may be in the world of science fiction, we think it violates the Constitution's basic guarantee that a defendant shall not be punished for "Crimes" unless tried before and convicted by an impartial jury.  *See* U.S. Const. art. III, § 2 ("The Trial of all Crimes, except in cases of Impeachment, shall be by Jury . . . ."); U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . .").  It may be tempting to depart from that principle where, as here, the contemplated deeds are horrific beyond measure, but it remains a fact that the only crime for which Mr. Allen was charged or convicted was distribution of a controlled substance.

If the government, federal or state, believes Mr. Allen committed a crime in his dealings with Ms. A or at the Wal-Mart, it is free to bring a prosecution for that conduct.  In such a proceeding, Mr. Allen would be entitled to put the government to its proof.  Despite the wide latitude *Booker* granted district courts, we do not believe it sanctions an end-run around this fundamental process. *Booker*'s precursor, *Blakely*, warned against the unconstitutionality of just such a system:

> Those who would reject *Apprendi* are resigned to one of two alternatives.  The first is that the jury need only find whatever facts the legislature chooses to label elements of the crime, and that those it labels sentencing factors—no matter how much they may increase the punishment—may be found by the judge.  *This would mean, for*

---

[7] Minority Report (Twentieth Century Fox and Dreamworks Pictures 2002).

*example, that a judge could sentence a man for committing murder even if the jury convicted him only of illegally possessing the firearm used to commit it—or of making an illegal lane change while fleeing the death scene. Not even Apprendi's critics would advocate this absurd result.* The jury could not function as circuitbreaker in the State's machinery of justice if it were relegated to making a determination that the defendant at some point did something wrong, a mere preliminary to a judicial inquisition into the facts of the crime the State *actually* seeks to punish.

*Blakely v. Washington*, 542 U.S. 296, 306-307 (2004) (first emphasis added and internal citation omitted). This case presents precisely the scenario the *Blakely* Court labeled as too "absurd" to contemplate: that a judge could sentence a man for attempted sexual abuse or solicitation of murder, even though he was convicted only of distribution of methamphetamine. We do not believe that the Court's remedial decision in *Booker* departs so dramatically from the Court's interpretation of the Sixth Amendment in *Blakely* that what was absurd in *Blakely* is now a reasonable practice after *Booker*.

If this case had arisen under the mandatory Guidelines, it would be easy to decide. The Sentencing Commission, acting under the authority of Congress, incorporated safeguards to ensure that judicial fact-finding under the Guidelines would not stray too far from the actual offenses for which the defendant was convicted—whether the offense of conviction or the past offenses that make up the criminal history calculation. Prominent among these safeguards were the relatedness principle, the principle that criminal history must be based on prior convictions, and the principle that departures based upon predicting the likelihood

that an offender will commit other crimes must be based upon specific factors—prior criminal convictions and similar unconvicted criminal conduct. Under this system, the district court could not have set aside the sentencing range specified for a person who commits Mr. Allen's offense with his criminal history, and replaced it with the sentence appropriate to a person convicted of crimes with which Mr. Allen has never been charged, which a reasonable jury might find he never committed, and which have no logical connection or relation to his drug distribution offense.

Many constitutionalists, including the five-Justice majority in the first half of *Booker*, believed that even the carefully cabined practice of judicial fact-finding allowed under the mandatory Guidelines was inconsistent with what they called "Sixth Amendment substance." *Booker*, 543 U.S. at 237. If their approach were pursued to its logical end, the outcome of this case would likewise be certain and sure. Mr. Allen was convicted based on a plea of guilty in which he admitted only to the distribution of a certain quantity of methamphetamine. Under a strict Sixth Amendment regime, such as that advocated by the remedial dissenters in *Booker*, Mr. Allen's uncharged, non-drug-related conduct could not be considered for sentencing purposes.

This case is not so easy, however, under *Booker*. To some extent—within the bounds of reasonableness—district courts are now free to sentence in ways not permitted under the Guidelines, and without benefit of jury fact-finding.

Sentencing courts are empowered to impose lengthier sentences when needed to protect the public from further crimes of the defendant, 18 U.S.C. § 3553(a)(2)(C). But we should not forget that the purpose of *Booker* was not to liberate sentencing courts from statutory constraints. It was to bring our sentencing system closer to the norms of the Sixth Amendment. If we affirm the sentence in this case as a legitimate exercise of *Booker* discretion, we would move in the opposite direction. Even more than was so under the mandatory Guidelines system, where the sentencing judge was limited to enhancements based on conduct related to the offense of conviction and previous convictions, or to departures based on previous convictions and adult misconduct similar to the offense, the jury would be "relegated to making a determination that the defendant at some point did something wrong, a mere preliminary to a judicial inquisition into the facts of the crime the State *actually* seeks to punish." *Blakely*, 542 U.S. at 307. If that is what the Supreme Court intended by the *Booker* decision, it should say so; we will not leap to that interpretation on our own authority.

In a case involving a variance of this magnitude, we hold that, whatever latitude a sentencing court may have to adjust a defendant's sentence in an exercise of *Booker* discretion, it may not discard the advisory Guideline range and impose sentence, instead, on the basis of evidence of the defendant's uncharged, unrelated misconduct, whether actually committed or contemplated for the future.

We are confident that on remand, the district court can fashion a sentence that reflects Mr. Allen's actual crime, that takes into account his dangerousness to the community, and that is sufficient, but not greater than necessary, to achieve the purposes of sentencing.

### III. CONCLUSION

We **VACATE** the sentencing order of the district court and **REMAND** for resentencing.