NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued November 10, 2010
Decided December 10, 2010

**Before**

RICHARD D. CUDAHY, *Circuit Judge*

DANIEL A. MANION, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 09-4149

| | |
|---|---|
| UNITED STATES OF AMERICA, | Appeal from the United States District |
| *Plaintiff-Appellee,* | Court for the Northern District of Illinois, |
| | Eastern Division. |
| *v.* | |
| | No. 08 CR 480 |
| UGUR YILDIZ, | |
| *Defendant-Appellant.* | Rebecca R. Pallmeyer, |
| | *Judge.* |

**O R D E R**

Ugur Yildiz pleaded guilty to willfully exporting, without a license, firearms qualifying as defense articles. *See* 22 U.S.C. § 2778(b)(2). The district court sentenced him to 90 months' imprisonment—33 months above the applicable guidelines range. Yildiz appeals, arguing that the court's decision to impose an above-range sentence was improper because it was based, not on the offense of conviction, but on uncharged, unrelated criminal conduct. We affirm.

## Background

In September 2005, after the Bureau of Alcohol, Tobacco, and Firearms revoked his federal firearms license, Yildiz legally transferred ownership and registration of 207 guns from his defunct firearms business into his own name. Beginning in June 2006, law enforcement authorities in Canada started a special investigation of Yildiz after they began recovering his firearms in connection with drug-related and violent crimes. In cooperation with the Canadian police investigation, ATF agents interviewed Yildiz twice in October 2006. He admitted that he made three trips to Canada between April and June and that on one of these trips he crossed the border with more than 200 weapons even though he knew it was illegal for him to export the guns. Yildiz explained that he brought the weapons into Canada to store them with a business associate, Daniel Wasiluk, until the two could arrange a deal to export the guns and other items to Turkey. But the two men disagreed about the value of the guns, and the deal never materialized. Yildiz claimed that he had not been able to reach Wasiluk since negotiations broke off around July 2006, and, as far as he knew, the guns were still in Wasiluk's storage facility.

The Canadian investigation continued, and the evidence mounted that Yildiz had knowingly sold the guns on the black market to the head of an organized crime ring. Canadian police seized more of Yildiz's guns in connection with crimes such as homicide, home invasion, drug trafficking, and assault. Canadian police also arrested Wasiluk in 2007, and he informed police that he never agreed to store Yildiz's guns. Instead, Wasiluk said that he had arranged a meeting between Yildiz and an Asian man named "Mikey," who police suspected was the head of a crime syndicate and whose real name, it turned out, was Huy Ta. The men met at a strip club where Wasiluk overheard Yildiz and Ta discuss a gun deal and saw them exchange phone numbers. Wasiluk told authorities that Yildiz later called him to say that something had gone wrong and that, if anyone asked, Wasiluk should confirm that he had a storage facility. Another individual, who was arrested for a drug crime and found with one of Yildiz's guns, informed Canadian police that Ta told him that he had recently received a shipment of 240 guns, and the informant provided the same phone numbers for Ta that police later linked to Yildiz's phone records. Canadian police later arrested Ta as well, and found three guns in his car, all of which were registered to Yildiz.

Yildiz was arrested in 2008, and he pleaded guilty to one count of illegal exportation of defense articles. In the presentence report, the probation officer assigned a base offense level of 26, *see* U.S.S.G. § 2M5.2(a)(1), and subtracted three levels for acceptance of responsibility, *see id.* § 3E1.1. With no prior criminal history, the probation officer calculated a guidelines range of 46 to 57 months based on a total offense level of 23. Canadian authorities had not yet disclosed all their investigative findings, so the presentence report

provided only a basic description of the offense, focusing on the fact that Yildiz transported the guns across the border knowing that his conduct was illegal. The probation officer did not find any reason for recommending an above-range sentence, but the presentence report did not include reference to Ta or the connection between Yildiz's guns and other criminal activity.

After the presentence report was issued, however, the government asked the district court to impose an above-guidelines sentence based on aggravating factors related to the offense and evidence of two instances of prior, uncharged criminal conduct. The government cross-referenced the adjustments in § 2K2.1(b)(1), which governs offenses involving the transportation of firearms, and asked the court to increase Yildiz's offense level by six for exporting more than 200 firearms. The government sought an additional four-level increase because the circumstances surrounding the transfer of the firearms meant it was reasonably foreseeable to Yildiz that the guns would fall into the hands of criminals and be used in other felony offenses. In relation to Yildiz's personal history and characteristics, the government urged the court to consider evidence that Yildiz had engaged in a pattern of fraud: he had masterminded an illegal scheme to purchase and export a large amount of Schedule III narcotics and lied to immigration officials to obtain citizenship.

At sentencing the government presented testimony from four witnesses. First, an ATF agent, who had interviewed Yildiz, described the inconsistencies in Yildiz's statements to authorities about his plan to store the firearms in Canada and his communications with Wasiluk. For example, although Yildiz insisted he lost contact with Wasiluk approximately one month after transporting the guns to Canada, the agent explained that phone records showed Yildiz regularly contacted Wasiluk through October 2006, when authorities initially interviewed Yildiz. Next, a detective with the Canadian police testified about the investigation into Yildiz's suspected gun trafficking and the statements Wasiluk made to police. He described the evidence tying Ta to Yildiz, including phone records showing over 30 calls between the two men during the three weeks around the time of Yildiz's last trip to Canada. The detective acknowledged several contradictions in Wasiluk's story, but emphasized that Wasiluk consistently described the meeting with Yildiz and Ta at the club and overhearing a discussion about guns, and he never wavered in saying that Yildiz's story about the storage agreement was a lie. To corroborate Wasiluk's account, the government introduced copies of Yildiz's phone records and evidence showing that, as of July 2009, Canadian police had seized 36 weapons registered to Yildiz in connection with serious criminal activity.

As for Yildiz's uncharged criminal conduct, the government presented testimony from two witnesses who described Yildiz's involvement in a scheme to export controlled

substances and his false statements to immigration officials. An agent with the Drug Enforcement Administration explained that Yildiz had recruited a pharmacist, Richard Wahlstrom, to front a pharmaceutical supply business for him. In 2006, the business purchased 939,000 dosages of hydrocodone, a Schedule III controlled substance, but never filed the required documentation with the DEA to show the disposition of those pills. When DEA agents later searched the business's office, which was located in the same building as Yildiz's defunct firearms business, they could not find the drugs or any record of their sale. Curiously, Yildiz showed up during the search, but initially denied any connection to the pharmaceutical business other than serving as the landlord for the property. Four days later, however, Yildiz informed police that he had the missing drugs, and, after meeting police at the property, he broke open a wall connecting the business office to his gun shop and pulled out roughly half the missing pills. According to the DEA agent, Yildiz told police that he had hidden the drugs for safekeeping until he could get approval to ship them to Turkey, but never explained what happened to the rest of the drugs. The DEA agent also testified that Yildiz called all the shots, served as the financial backer for the pharmaceutical business, and that Yildiz threatened Wahlstrom at gunpoint when Wahlstrom resisted placing a drug order for him. Although the agent recommended prosecuting Yildiz, she confirmed that Yildiz was never charged with a crime.

Last, an agent with Immigration and Customs Enforcement testified about the suspicious circumstances and evidence of fraud relating to Yildiz's applications for temporary residence and, later, for citizenship. Over the years Yildiz had given conflicting accounts to immigration officials about the timing and circumstances of his entry to the United States—initially claiming that he crossed the border from Mexico by himself at age 12 to work as a blueberry picker, later saying that he came in as a student and had a green card, and later still saying that he came over from Turkey with his father when he was about 6 years old. But when he submitted his 2002 application for citizenship, Yildiz swore under oath that he had never given false or misleading information to an immigration official. Despite this evidence of fraud in his file, Yildiz was granted citizenship in 2003.

Yildiz attacked the government's evidence, arguing that it was unreliable and that the statements Wasiluk and Wahlstrom gave to authorities were self-serving and not credible. Yildiz insisted that Wasiluk double-crossed him and sold the weapons to Ta on his own without Yildiz's knowledge or consent. Yildiz characterized his conduct as "a handshake deal" with Wasiluk that resulted in "an honest business mistake," and urged the court to consider that he had no prior criminal history, that he had strong family ties, and that he had experienced health problems since being detained in jail. Yildiz also argued that the evidence relating to the incident with the pharmaceutical business and the alleged immigration fraud was irrelevant because he was never charged, and, thus, the court could not consider it at sentencing.

The district court rejected Yildiz's version of the events and determined that an above-range sentence was warranted based on the large number of guns involved, the use of the weapons in further criminal activity, and the evidence of additional criminal misconduct. The court agreed with the government's recommendation for a six-level increase in the offense level because of the large number of weapons involved and, referencing § 2K2.1(b)(1), recalculated a base offense level of 29. The court also found that the government presented sufficient evidence to show that Yildiz masterminded the pharmaceutical scandal and lied to immigration authorities. The court determined that "even a modest recognition of th[is] wrongdoing," such as assessing a one-level increase in Yildiz's criminal history category, would result in an adjusted range of 97 to 121 months. Explaining the necessity for an upward adjustment, the district judge stated:

> I don't need to draw the conclusion for which the government has argued; i.e., that Mr. Yildiz knew that what he was doing was dumping guns into Canada into [the] hands of unlawful—of criminals, in order to conclude that a sentence beyond at least the calculated guideline is appropriate here. Again, the enhancement that I think is appropriate reflects the number of weapons involved and the fact that Mr. Yildiz has engaged in unlawful conduct in the past that has never been charged. So I'm again concluding that the appropriate guideline under my calculation would be from 97 to 121 months.

But in light of Yildiz's family considerations, the court imposed a sentence of 90 months' imprisonment. And in its written statement of reasons, the court summarized the facts justifying an above-range sentence:

> Defendant was involved in transporting a very large number of weapons over the border, dozens of which have been traced to violent crimes and drug offenses in Canada. Defendant argues that there is no evidence that he was aware that the guns he transported would be used for criminal purposes, but his own version of events—that he deposited the guns in a storage locker in Canada pursuant to a "handshake" deal and intending to ship them illegally yet again—reveals a shocking lack of concern for a substantial cache of deadly weapons. Nothing in the record provides any basis for a conclusion that Defendant understood that the guns were to be used for any lawful purpose. Whether viewed as a departure reflecting the number of weapons involved or a sentencing variance, an above-guidelines sentence is warranted.

The court then explained that the "§ 3553 factors, also militate against leniency," and noted that Yildiz's criminal history was understated based on the evidence of immigration fraud, his "unlawful exportation of thousands of pills," and his failure to pay taxes on any of his

legal business ventures for years.  The court concluded by recognizing that although Yildiz has a loving and supportive family, "a lengthy sentence [was] necessary to afford adequate deterrence, protect the public from further offenses, and reflect the seriousness of this offense conduct."

## Analysis

On appeal Yildiz argues that the district court erred by sentencing him above the guidelines range based on uncharged misconduct.  But sentencing courts have broad discretion to consider uncharged or even acquitted conduct as long as the conduct is established by a preponderance of the evidence.  *United States v. Watts*, 519 U.S. 148, 152 (1997) (per curiam); *United States v. Mays*, 593 F.3d 603, 609-10 (7th Cir. 2010); *United States v. Heckel*, 570 F.3d 791, 797 (7th Cir. 2009); *see* 18 U.S.C. § 3661; U.S.S.G. § 1B1.4.  Yildiz's brief includes a single sentence suggesting that the government's evidence of his involvement in the drug scheme and immigration fraud was unreliable because it rested on the self-serving statements of Wahlstrom—who had reason to minimize his own role in the misconduct—or stale evidence of statements made to immigration officials 20 years ago.  But Yildiz does not develop an argument that the district court clearly erred in making its factual findings.  *See United States v. Santiago*, 495 F.3d 820, 824 (7th Cir. 2007).  And any such argument would be untenable given the mountain of evidence the government introduced at sentencing to show that Yildiz had given false statements to immigration authorities, surreptitiously controlled the pharmaceutical supply business, and admitted concealing a large amount of controlled substances from federal agents with plans to illegally export the drugs to Turkey.  All this evidence reflected Yildiz's pattern of engaging in fraud and demonstrated that his criminal history was underrepresented, even though he had no prior convictions.

In a related argument, Yildiz contends that even if the district court could take into account some types of uncharged conduct, it still could not consider the immigration fraud or drug scandal because those incidents had nothing to do with the illegal exportation of weapons.  He cites *United States v. Allen*, 488 F.3d 1244 (10th Cir. 2007), in support of his argument that the court could consider only uncharged conduct similar to the conviction offense.  In *Allen*, the defendant had been convicted for drug possession, but the government introduced evidence that he had discussed with a paramour his desire to kidnap and rape a child and that a witness identified the defendant as the man who had attempted to abduct her 10-year old daughter from a store.  488 F.3d at 1246-48.  The district court found this evidence credible, but instead of considering the uncharged conduct as understated criminal history, it looked to the guideline for sexual abuse offenses and sentenced the defendant as though he actually had abducted and sexually assaulted a young child.  *Id.* at 1251-52.  The Tenth Circuit remanded the case, concluding that the

district court had given excessive weight to unrelated, uncharged conduct in imposing a sentence 225 months above the applicable guidelines range. *Id.* at 1259.

But Yildiz's case is distinguishable from *Allen* because most of the increase in Yildiz's sentence is attributable to aggravating factors directly related to the conviction offense—namely, the large number of weapons involved and their use in continued criminal activity. Unlike the defendant in *Allen*, Yildiz was not sentenced for crimes that he merely thought about committing or that he only discussed with someone. Here, after determining that a preponderance of the evidence supported findings that Yildiz masterminded the drug scandal and that he lied to immigration officials, the district court assessed a modest increase for the uncharged conduct, but still sentenced Yildiz largely based on the nature and circumstances of the conviction offense. In fact, if the district court had applied just the six-level increase for the number of weapons and refused to consider the additional uncharged conduct, it still would have resulted in an adjusted range of 87 to 108 months and Yildiz's 90-month sentence would have been at the low end of even that range. Thus, his argument that the district court's sentence was "substantially based on uncharged, unrelated conduct" and "totally irrelevant evidence" is unpersuasive.

Here, the district court relied on § 3553(a)(1) and determined that Yildiz's uncharged misconduct reflected a troubling pattern of dishonesty, of which the conviction offense was just the latest in a series of schemes to defraud others for economic gain. Because Yildiz had not been convicted for his prior misconduct, the court concluded that his criminal history was underrepresented and assessed a modest increase in his guidelines range. Unlike the sentence in *Allen*, most of the increase in Yildiz's sentence is attributable to aggravating factors directly related to the conviction offense or his pattern of misconduct that the court determined was highly relevant to his illegal exportation of weapons.

Finally, even if the district court could consider the uncharged conduct, Yildiz argues, it improperly weighed this conduct in its sentencing decision. Sentences are reviewed for reasonableness under an abuse-of-discretion standard. *Gall v. United States*, 552 U.S. 38, 51 (2007); *United States v. Williams*, 616 F.3d 685, 694 (7th Cir. 2010). In imposing a sentence outside the guidelines range, a sentencing court need only state its reasons, consistent with § 3553(a), for determining why the sentence is appropriate for a particular defendant. *United States v. Angle*, 598 F.3d 352, 359 (7th Cir. 2010); *United States v. Valle*, 458 F.3d 652, 658 (7th Cir. 2006). Contrary to Yildiz's argument that his sentence was substantially increased based on uncharged conduct, the district court explained that most of the upward adjustment was attributed to the six-level increase the court assessed for the large number of guns involved in the crime. As a result, Yildiz's offense level jumped from 23 to 29, and his corresponding guidelines range increased from 46 to 57 months, to 87 to 108 months. Yildiz did not object to this increase or the court's decision to look to

§ 2K2.1(b)(6) in calculating the six-level adjustment. The court then considered the government's evidence of immigration fraud, the illegal drug scheme, and the recovery of the guns in connection with serious criminal activity, and determined that this misconduct warranted an increase of one criminal history category, yielding a range of 97 to 121 months' imprisonment. In recognition of Yildiz's arguments in mitigation, the court declined to sentence him even within that adjusted range. In arriving at a sentence of 90 months, the court explained its decision in relation to the § 3553(a) factors, noting that a longer sentence was necessary to deter future criminal activity, protect the public, and account for the seriousness of Yildiz's offense. The explanation the court provided at Yildiz's sentencing hearing and in its subsequent written statement of reasons sufficiently supports its above-guidelines sentence.

AFFIRMED.